[Crim. No. 4298. In Bank. Feb. 13, 1942.]

In re RUFUS BELL et al., on Habeas Corpus.

Andersen & Resner, George R. Andersen and Herbert Resner for Petitioners.

Joseph L. Heenan, District Attorney (Yuba), and Erling S. Norby for Respondent.

TRAYNOR, J.—Petitioners, members of a labor union, while engaged in picketing certain ranches and orchards, were arrested and charged with violating sections 2 and 3 of an anti-picketing ordinance adopted by the Board of Supervisors of Yuba County in 1937. These sections read as follows: "Section 2. It is unlawful for any person to loiter, stand, or sit upon any public highway, alley, sidewalk or crosswalk so as to in any manner hinder or obstruct the free passage therein or thereon of persons or vehicles passing or attempting to pass along the same, or so as to in any manner annoy or molest persons passing along the same."

"Section 3. It is unlawful for any persons to beset or picket the premises of another, or any approach thereto, where any person is employed or seeks employment, or any place or approach thereto where such employee or person seeking employment lodges or resides, for the purpose of inducing such employee or person seeking employment, by means of compulsion, coercion, intimidation, threats, acts of violence, or fear to quit his or her employment or to refrain from seeking or freely entering into employment."

The complaint did not specify the acts of misconduct on the part of petitioners but followed the language of the ordinance. It charged petitioners in count 1 with violating any one "and/or" any other provision of section 2, and in count 2, with violating any one "and/or" any other provision of section 3. They were tried in the Justice's Court of Marysville Township, County of Yuba, found guilty "as charged in the complaint," and sentenced "on said conviction" to a fine of $500 or 6 months in jail. On appeal the superior court, the court of last resort in cases arising in a municipal or justice's court (Cal. Const., art. VI, sec. 5) unheld the constitutionality of the ordinance and affirmed the conviction, but reduced the jail sentence to 3 months. Petitioners thereafter applied to the superior court for a writ of habeas corpus on the ground that the ordinance was unconstitutional. When that court denied the writ, petitioners renewed their application in the District Court of Appeal, but the latter court also denied the writ and upheld the ordinance as constitutional. Petitioners now ask this court for a writ of habeas

corpus, contending that the ordinance prohibits peaceful picketing and therefore abridges freedom of speech, press and assemblage in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States and article I, sections 9 and 10 of the Constitution of California.

A preliminary question is whether the constitutionality of an ordinance may be tested by application for a writ of habeas corpus. Most jurisdictions permit such a use of habeas corpus. (See cases collected in 25 Am. Jur. 164, sec 29; 13 Cal. Jur. 225, sec. 8; 39 L. R. A. 450; 32 A. L. R. 1054.) They adhere to the theory, however, that habeas corpus can lie, not to substitute for a writ of error, but only to test the jurisdiction of the trial court or to secure the release of persons detained without judicial authorization or under a void proceeding. (See 25 Am. Jur. 151, sec. 13; 13 Cal. Jur. 217, sec. 4; *Ex parte Nielsen*, 131 U. S. 176 [9 S. Ct. 672, 33 L. Ed. 118]; *Harlan* v. *McGourin*, 218 U. S. 442 [31 S. Ct. 44, 54 L. Ed. 1101]; *Ex parte Moran*, 144 Fed. 594 [75 C. C. A. 396]; 1 Bailey, Habeas Corpus [1913], sec. 2, 30 *et seq.;* 12 N. Y. L. Q. R. 525.) The theory and the practice are somewhat inconsistent. In order to reconcile them the courts have resorted to the artificial reasoning of *Ex parte Siebold*, 100 U. S. 371 [25 L. Ed. 717], that an unconstitutional statute is actually not a statute, and that a trial court therefore has no jurisdiction over the subject-matter of proceedings based upon such a statute. The unconstitutionality of a statute, however, is not a foregone conclusion but the very question at issue and it has traditionally been one that trial courts have jurisdiction to decide. (See 39 L. R. A. 454.) State courts constantly make decisions regarding the validity of statutes under the Constitution of the United States, and the United States Supreme Court, which reviews their determinations by writ of error, has expressly stated that they have jurisdiction in such cases. (See *Robb* v. *Connolly*, 111 U. S. 624 [4 S. Ct. 544, 28 L. Ed. 542].) If they lacked it the United States Supreme Court would be compelled to reverse the decision of a state court because of lack of jurisdiction without further inquiry into the merits of the case. (See *Mansfield C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379 [4 S. Ct. 510, 28 L. Ed. 462].) It has never been held that a decision holding a statute invalid is void because the statute itself

was void. "Therefore, unless we adopt the peculiar theory that the court has jurisdiction to decide right, but not to decide wrong, we are driven to the conclusion that a decision is not void for lack of jurisdiction merely because it decides that an unconstitutional statute is valid." (39 L. R. A. 454; see McGovney, Cases on Constitutional Law [1st ed.], pp. 198-200.)

A minority of courts, realizing the inconsistency between the practice of using habeas corpus to test constitutionality and the theory that it lies only to test jurisdiction, will not permit the question of constitutionality to be raised by habeas corpus. (See cases cited in 25 Am. Jur.; 39 L. R. A.; 32 A. L. R., all *supra*.) There is, however, a less drastic solution. The courts can permit an independent review by habeas corpus of matters over which the trial court had jurisdiction, apart from any remedy by appeal, because it is warranted by the importance of securing a correct determination on the question of constitutionality. "It must never be forgotten that the writ of *habeas corpus* is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired. . . . the rule is not so inflexible that it may not yield to exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent." (Chief Justice Hughes in *Bowen* v. *Johnston,* 306 U. S. 19, 26, 27 [59 S. Ct. 442, 83 L. Ed. 455].) There are instances where habeas corpus affords the only method of testing constitutionality as when a statute upheld as valid at the time of conviction is subsequently declared invalid in another case and in the interim the petitioner either exhausts his remedy by appeal or the time for taking an appeal expires. (*Ex parte Lockhart,* 25 Okla. Cr. 429 [221 Pac. 119]; *In re Jarvis,* 66 Kan. 329 [71 Pac. 576].) In California only a writ of habeas corpus enables a higher court to decide the question of constitutionality in cases which, like the present one, arise in a justice's or municipal court and can be appealed only to the superior court. (See *Ex parte Siebold, supra,* involving a similar situation.)

Habeas corpus is also widely used to test the constitutionality not only of a statute but of the procedure in petitioner's trial, even though the trial court has jurisdiction to try the petitioner (see *Ex parte Nielsen, supra;* 35 Columb. L. Rev. 404 at 412), and any infringement of constitutional right

during the trial may be raised on appeal. The federal courts have repeatedly held that habeas corpus lies if the accused has been deprived of such fundamental constitutional guarantees as the right to counsel (*Johnson* v. *Zerbst,* 304 U. S. 458 [58 S. Ct. 1019, 82 L. Ed. 1461]; see *Powell* v. *Alabama,* 287 U. S. 45 [53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527]), the right to a fair trial free from mob violence (*Moore* v. *Dempsey,* 261 U. S. 86 [43 S. Ct. 265, 67 L. Ed. 543]) or free from the use of testimony known to the prosecution to be perjured (*Mooney* v. *Holohan,* 294 U. S. 103, 105 [55 S. Ct. 340, 79 L. Ed. 791, 98 A. L. R. 406].) (See, also, *Tumey* v. *Ohio,* 273 U. S. 510 [47 S. Ct. 437, 71 L. Ed. 749], insuring the right to an impartial judge.) The federal courts regard these rights as so fundamental as to admit an additional special procedure to insure their protection once the remedy in the state courts is exhausted (*Mooney* v. *Holohan, supra*), or is no longer available (*Johnson* v. *Zerbst,* 304 U. S. 458 [58 S. Ct. 1019, 82 L. Ed. 1461].)

There are other situations in which habeas corpus is used, not as a test of jurisdiction, but to review a question of law that cannot otherwise be raised or is so important as to render the ordinary procedure inadequate. Thus, it lies to test whether there is probable cause to justify the committing magistrate in holding petitioner for trial. (Pen. Code sec. 1487; *Ex parte Williams,* 52 Cal. App. 566 [199 Pac. 347]; *Application of Hartwell,* 28 Cal. App. 627 [153 Pac. 730]; see, also, cases cited in 13 Cal. Jur. 230, sec. 12; 25 Am. Jur. 170, sec. 37.) There is no other method of securing a review of the magistrate's determination in this regard. (*People* v. *Creeks,* 170 Cal. 368 [149 Pac. 821]; *Ex parte Williams, supra.*) It also lies to test whether the complaint charges a public offense (*Ex parte Williams,* 121 Cal. 328 [53 Pac. 706]; *Ex parte McNulty,* 77 Cal. 164 [19 Pac. 237, 11 Am. St. Rep. 257]; *People ex rel. Perkins* v. *Moss,* 187 N. Y. 410 [80 N. E. 383, 10 Ann. Cas. 309, 11 L. R. A. (N. S.) 528]; see, also, 13 Cal. Jur. 232, sec. 14; 25 Am. Jur. 174, sec. 42; and 35 Columb. L. Rev. 850 at 862) even though this question falls within the jurisdiction of the trial court and may be raised on appeal. Certain courts go so far as to permit the use of habeas corpus before trial when the statute of limitations has run upon the offense charged. (*United States* v. *Mathues,* 27 Fed. (2d) 137; see *Ex parte Vice,* 5 Cal. App. 153 [89 Pac. 983]; *People* v. *McGee,* 1 Cal. (2d) 611 [36 Pac.

(2d) 378] ; *People* v. *Hoffman,* 132 Cal. App. 60 [22 Pac. (2d) 229] ; see 35 Columb. L. Rev. 407.)

While a few courts require that all available remedies by appeal be exhausted before habeas corpus can be invoked to test constitutionality (see *Goto* v. *Lane,* 265 U. S. 393 [44 S. Ct. 525, 68 L. Ed. 1070]), most jurisdictions, including California, do not make the requirement mandatory (see cases collected in 13 Cal. Jur. 225, sec. 8; 25 Am. Jur. 164, sec. 29), and even permit the issue of constitutionality to be raised by habeas corpus before trial. *(Ibid, Matter of Zany,* 20 Cal. App. 360 [129 Pac. 295] ; *Ex parte Royall,* 117 U. S. 241 [6 S. Ct. 734, 29 L. Ed. 868] ; contra, *Glasgow* v. *Moyer,* 225 U. S. 420 [32 S. Ct. 753, 56 L. Ed. 1147] ; *Johnson* v. *Hoy,* 227 U. S. 245 [33 S. Ct. 240, 57 L. Ed. 497].) Since the granting of a writ of habeas corpus, however, results in the release of the petitioner, while reversal on appeal may result merely in a new trial with the exclusion of those charges found based on unconstitutional enactments or the inclusion of that procedure found constitutionally guaranteed, the court may in its discretion refuse to grant the writ if the remedy by appeal is not exhausted. This rule, adopted by the federal courts (*In re Lancaster,* 137 U. S. 393 [11 S. Ct. 117, 34 L. Ed. 713] ; *In re Chapman,* 156 U. S. 211 [15 S. Ct. 331, 39 L. Ed. 401] ; *Riggins* v. *United States,* 199 U. S. 547 [26 S. Ct. 147, 50 L. Ed. 303] ; *United States* v. *Sing Tuck,* 194 U. S. 161 [24 S. Ct. 621, 48 L. Ed. 917] ; *Henry* v. *Henkel,* 235 U. S. 219 [35 S. Ct. 54, 59 L. Ed. 203] ; see 35 Columb. L. Rev. 404 at 412, 414), should also be followed by the courts of this state.

In the present case petitioners, having exhausted their remedy by appeal, seek by habeas corpus to assert the invalidity of the ordinance as a whole. Habeas corpus is not merely the proper remedy under such circumstances but the only one that will enable this court to decide upon the constitutionality of the ordinance.

The ordinance must be judged on its face to determine whether it unconstitutionally prohibits acts that fall within the category of peaceful picketing. (*Thornhill* v. *Alabama,* 310 U. S. 88 [60 S. Ct. 736, 84 L. Ed. 1093] ; *Carlson* v. *California,* 310 U. S. 106 [60 S. Ct. 746, 84 L. Ed. 1104] ; *Hague* v. *C. I. O.,* 307 U. S. 496, 518 [59 S. Ct. 954, 83 L. Ed. 1423] ; *Schneider* v. *State,* 308 U. S. 147, 162-165 [60 S.

Ct. 146, 84 L. Ed. 155]; *Lovell* v. *Griffin,* 303 U. S. 444, 451 [58 S. Ct. 666, 82 L. Ed. 949]; *Stromberg* v. *California,* 283 U. S. 359, 369, 370 [51 S. Ct. 532, 75 L. Ed. 1117]. See *Near* v. *Minnesota,* 283 U. S. 697 [51 S. Ct. 625, 75 L. Ed. 1357]; *Yick Wo* v. *Hopkins,* 118 U. S. 356 [6 S. Ct. 1064, 30 L. Ed. 220].) If certain of its provisions operate to prohibit peaceful picketing, they are invalid even though they also prohibit acts that may properly be made illegal. A penal statute that ''does not aim specifically at evils within the allowable area of State control, but on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press . . . lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure'' and ''results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview.'' (*Thornhill* v. *Alabama, supra* at 97.) It is not the function of the court to determine whether the restrictions imposed by the legislation can be validly applied to the facts of a particular case. ''Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas.'' (*Thornhill* v. *Alabama, supra* at 97; *Hague* v. *C. I. O., supra; Lovell* v. *Griffin, supra; Schneider* v. *State, supra.*) Language prohibiting conduct that may be prohibited and conduct that may not affords no reasonably ascertainable standard of guilt and is therefore too uncertain and vague to be enforced. (*Stromberg* v. *California, supra,* 369-370; *Herndon* v. *Lowry,* 301 U. S. 242, 261-263 [57 S. Ct. 732, 81 L. Ed. 1066]; *Lanzetta* v. *New Jersey,* 306 U. S. 451 [59 S. Ct. 618, 83 L. Ed. 888]; *De Jonge* v. *Oregon,* 299 U. S. 353 [57 S. Ct. 255, 81 L. Ed. 278]; *Hague* v. *C. I. O., supra; Schneider* v. *State, supra; In re Harder,* 9 Cal. App. (2d) 153, 155 [49 Pac. (2d) 304]; *Territory of Hawaii* v. *Anduha,* 48 Fed. (2d) 171.) A conviction based upon such a statute cannot stand even though the acts of misconduct in the particular case could be validly prohibited by properly drafted legislation. (*Thornhill* v. *Alabama, supra; Carlson* v. *California, supra.*)

█ Section 2 of the present ordinance makes it a crime ''for any person to loiter, stand, or sit upon any public highway,

alley, sidewalk or crosswalk so as to in any manner hinder or obstruct the free passage . . . of persons or vehicles . . .''. This language encompasses conduct that is well within the bounds of peaceful picketing sanctioned by the guarantees of due process of law. Thus a picket may be peaceful even though he loiters, stands, or sits upon a public highway, alley, sidewalk, or crosswalk, and thereby constitutes to some extent an obstruction to the free passage of persons and vehicles or an annoyance to persons who do not approve of his presence. (See *Thornhill* v. *Alabama, supra; Carlson* v. *California, supra; In re Harder, supra; Territory of Hawaii* v. *Anduha, supra; In re Williams,* 158 Cal. 550 [111 Pac. 1035].) The sweeping prohibition of section 2 would apply equally against peaceful pickets, shoppers engrossed in a window display, invalids in wheelchairs, acquaintances who stand engaged in conversation. The entire section is therefore invalid even though Yuba County might validly prohibit excessive and unnecessary obstruction of the streets and highways.

■ Section 3 of the ordinance likewise makes conduct generally recognized as peaceful picketing unlawful. Peaceful picketing in the course of a labor dispute involves besetting the premises of another for the purpose of inducing employees to quit their employment or dissuading others from seeking employment. The fact that to some extent compulsion, coercion, intimidation, or threats are employed does not detract from its peaceful nature so long as they constitute only economic, moral, or social pressure and not the pressure of violence. (See *McKay* v. *Retail Automobile Salesmen's Local Union No. 1067,* 16 Cal. (2d) 311 [106 Pac. (2d) 373] ; *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550; *Lisse* v. *Local Union No. 31,* 2 Cal. (2d) 312 [41 Pac. (2d) 314] ; *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324].) The character of the picketing is determined not by the existence of a threat but by what is actually threatened. (See dissenting opinion of Justice Holmes in *Vegelahn* v. *Guntner,* 167 Mass. 92 [44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722].) A picket may point to the possibility of ousting from the union any employee crossing the picket line and thereby compel or coerce him to quit his employment. The provisions of section 3 prohibiting such conduct are invalid.

■ That part of section 3, however, prohibiting picketing

by acts of violence is valid, for there is no constitutional sanction for violence in labor disputes. When part of a statute is declared unconstitutional, the remainder will stand if it is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute. (*Ex parte Frazer*, 54 Cal. 94; 5 Cal. Jur. 644; Cooley, Constitutional Limitations (8th ed.), vol. 1, p. 360.) Not only is the valid part of the present ordinance complete in itself, but the ordinance provides: "If any section, subsection, sentence, clause or phrase of this ordinance is for any reason held to be unconstitutional or invalid, such decision shall not affect the validity or constitutionality of the remaining portions of this ordinance." (See *Bacon Service Corp.* v. *Huss*, 199 Cal. 21 [248 Pac. 235].)

The provisions of section 3 prohibiting picketing by acts of violence do not conflict with the general laws of the state relating to assault, battery, riot, disturbing the peace, and unlawful assemblage. An ordinance is invalid if it makes illegal the same acts that are made illegal by the general laws of the state. (Cal. Const., art. XI, sec. 11; *Ex parte Sic*, 73 Cal. 142 [14 Pac. 405]; *In re Mingo*, 190 Cal. 769 [214 Pac. 850]; *In re Murphy*, 190 Cal. 286 [212 Pac. 30]; *Ex parte Stephen*, 114 Cal. 278 [46 Pac. 86]; *Ex parte Daniels*, 183 Cal. 636 [192 Pac. 442, 21 A. L. R. 1172].) Picketing by acts of violence, however, is an offense distinct from assault, battery, riot, disturbing the peace, or unlawful assemblage, even though it may sometimes involve these acts. The nature of a crime involving violence varies with the purpose for which the violence is employed. This ordinance prohibits the use of violence for the purpose of preventing employees or patrons from entering premises being picketed in connection with a labor dispute. It therefore defines an offense different from general acts of violence unconnected with a labor controversy.

When a petitioner has been convicted of violating a statute that is entirely unconstitutional, the court will ordinarily issue a writ of habeas corpus releasing him from custody. The present ordinance, however, contains a valid provision prohibiting acts of violence. The complaint charges petitioners with picketing by acts of violence and therefore charges a public offense for such acts are not consistent with lawful action. (See cases cited in 13 Cal. Jur., pp. 235, 236, note 7; *cf. Ex parte Peterson*, 119 Cal. 578 [51 Pac. 859]; *Ex parte*

*McLaughlin,* 16 Cal. App. 270 [116 Pac. 684] ; *In re Hernandez,* 64 Cal. App. 71 [220 Pac. 423] ; *Ex parte Greenall,* 153 Cal. 767 [96 Pac. 804] ; *In re Ah Sing,* 156 Cal. 349 [104 Pac. 448].) Since the punishment imposed on petitioners is not excessive for violation of the valid provision of the ordinance, they can be released by habeas corpus only if it is clear that they were not convicted of violating that provision. (*Ex parte Morrison,* 88 Cal. 112 [25 Pac. 1064].)

The uncertainty surrounding their conviction arises from the ambiguity of the complaint, which charged them with violating any one "and/or" any other provision of the ordinance, count 1 referring to section 2 and count 2 referring to section 3. Petitioners were in effect charged with violating all the provisions of each section of the ordinance or any one provision of each section. They were found guilty "as charged" and sentenced "on said conviction." It cannot therefore be determined from the face of the record whether or not they were found guilty of violating the one valid provision of section 3.

The expression "and/or", which made possible a conviction couched in such general terms, has met with widespread condemnation. (*Cochrane* v. *Florida East Coast Ry. Co.,* 107 Fla. 431 [145 So. 217] ; *Preble* v. *Architectural Iron Workers Union,* 260 Ill. App. 435; *Tarjan* v. *National Surety Co.,* 268 Ill. App. 232; *State* v. *Dudley,* 159 La. 872 [106 So. 364] ; *Russell* v. *Empire Storage & Ice Co.,* 332 Mo. 707 [59 S. W. (2d) 1061] ; *State* v. *Douglas,* 339 Mo. 187 [95 S. W. (2d) 1179] ; *Drummond* v. *City of Columbus,* 136 Neb. 87 [285 N. W. 109, 286 N. W. 779] ; *Kornbrodt* v. *Equitable Trust Co.,* 137 Ore. 386 [2 Pac. (2d) 236, 3 Pac. (2d) 127] ; *Allen* v. *State,* 138 Tex. Cr. 303 [136 S. W. (2d) 232] ; *Cobb* v. *State,* 139 Tex. Cr. 337 [139 S. W. (2d) 272] ; *Putnam* v. *Industrial Commission,* 80 Utah 187 [14 Pac. (2d) 973] ; *Employers' Mutual Liability Ins. Co.* v. *Tollefson,* 219 Wis. 434 [263 N. W. 376] ; An And/Or Symposium, 18 A. B. A. Journal 574; 18 A. B. A. Journal 456, 524 (editorials) ; 42 West Va. L. Q. 235; H. H. Parsons, And/Or, 10 Cal. State Bar, J. 89, *cf.* H. Mumper, Unfair Tirade Against the Symbol "And/Or", 10 Cal. State Bar. J. 187.) It is true that the expression has proved convenient in contracts and other instruments where, by its intentional equivocation, it can anticipate alternative possibilities without the cumbersome itemization of each one. (118 A. L. R. 1367; 43 Yale L. J. 918, 20 Marquette L.

Rev. 101.) It lends itself, however, as much to ambiguity as to brevity. Thus it cannot intelligibly be used to fix the occurrence of past events. A purported conclusion that either one or both of two events occurred is a mere restatement of the problem, not a decision as to which event actually occurred. If a person is accused of violating an unconstitutional as well as a constitutional provision of a statute and the verdict by the use of "and/or" declares him guilty of violating either one or both provisions, it is an open question whether he is guilty of any punishable offense. The verdict in effect states that the accused is guilty or innocent of violating the constitutional provision. A comparable lack of precision was censured by the United States Supreme Court in *Stromberg* v. *California,* 283 U. S. 359, 368 [51 S. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484] : "The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. . . . It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." The ambiguity of the judgment in the present case would thus clearly warrant a reversal of the conviction on appeal or other direct attack. (See, also, *People* v. *Moss,* 33 Cal. App. (2d) (Supp.), 763, 767 [87 Pac. (2d) 932] ; *People* v. *Tomlinson,* 35 Cal. 503, 508.)

A habeas corpus proceeding, however, is in the nature of a collateral attack, and a judgment that is collaterally attacked carries with it a presumption of regularity. (*Johnson* v. *Zerbst,* 304 U. S. 458, 468 [58 S. Ct. 1019, 82 L. Ed. 1461] ; see 1 Freeman, Judgments (5th ed.) 780, *et seq.;* 15 Cal. Jur. 64, *et seq.*) This presumption of regularity applies to the proceedings of a justice's court only if the judgment affirmatively shows, as in the present case, that the court has jurisdiction over person and subject matter. (*Brush* v. *Smith,* 141 Cal. 466 [75

Pac. 55]; *Hayward* v. *Pimental,* 107 Cal. 386 [40 Pac. 545]; *Rowley* v. *Howard,* 23 Cal. 401, 404. See 15 Cal. Jur. 503; 6 Cal. Jur. Supp. 611.) The presumption, however, is not conclusive in a habeas corpus proceeding but places upon petitioners the burden of proving that their convictions were based not upon the constitutional but upon the unconstitutional provisions of the ordinance. (*Johnson* v. *Zerbst, supra.*) Unless they can sustain this burden they must be considered as having been convicted of violating the valid provision relating to acts of violence, and the judgment must be upheld.

A petitioner seeking habeas corpus, however, is not confined to the face of the record in attempting to sustain the burden of proving that his conviction was in violation of his constitutional rights. The courts of both the United States and California have declared that the remedy of habeas corpus permits an examination not only of the actual evidence introduced at petitioner's trial but of any necessary additional evidence bearing upon the infringement of petitioner's constitutional rights. (*Moore* v. *Dempsey,* 261 U. S. 86 [43 S. Ct. 265, 67 L. Ed. 543]; *Mooney* v. *Holohan,* 294 U. S. 103 [55 S. Ct. 340, 79 L. Ed. 791, 98 A. L. R. 406]; *Herndon* v. *Lowry,* 301 U. S. 242 [57 S. Ct. 732, 81 L. Ed. 1066]; *Johnson* v. *Zerbst, supra; In re Connor,* 15 Cal. (2d) 161 [99 Pac. (2d) 248]; *In re Connolly,* 16 Cal. App. (2d) 709 [61 Pac. (2d) 490]; *In re Lake,* 65 Cal. App. 420 [224 Pac. 126]; *In re Chaus,* 92 Cal. App. 384 [268 Pac. 422]; see, also, *Fiske* v. *Kansas,* 274 U. S. 380 [47 S. Ct. 655, 71 L. Ed. 1108]; *De Jonge* v. *Oregon,* 299 U. S. 353 [57 S. Ct. 255, 81 L. Ed. 278]; *Norris* v. *Alabama,* 294 U. S. 587 [55 S. Ct. 579, 79 L. Ed. 1074]; *Powell* v. *Alabama,* 287 U. S. 45 [53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527].) This examination is made, not to pass upon the sufficiency of the evidence to support the verdict, but to determine what the verdict actually was, so that the court may decide whether it violates constitutional guaranties. Such an examination will be made in a habeas corpus proceeding whenever a petitioner has been deprived of due process of law, whatever form that deprivation has taken. If a court has no ''jurisdiction'' to enter a judgment against a defendant after depriving him of such constitutional guarantees as the right to counsel or to a fair trial free from mob domination, it has no ''jurisdiction'' to enter a judgment against him based upon an unconstitutional statute. An examination of the facts is permissible to determine

whether a petitioner was denied due process of law with respect to the procedure at his trial; it is no less permissible to determine whether he was denied due process of law by being convicted of violating unconstitutional legislation.

In *Herndon* v. *Lowry, supra,* a defendant was convicted of the crime of attempting to incite an insurrection. On appeal from a denial of his petition for a writ of habeas corpus, the United States Supreme Court examined the evidence introduced at his trial, concluded that it revealed only conduct that was protected by the constitutional guarantee of freedom of speech, and held that his conviction under the statute was therefore a denial of due process of law requiring the issuance of a writ of habeas corpus.

In *Johnson* v. *Zerbst, supra,* a defendant petitioned for a writ of habeas corpus on the ground that he had been deprived of his constitutional right to be represented by counsel at his trial. The court held that petitioner was entitled to a release on habeas corpus if an examination of the facts supported his allegation, stating, ''a prisoner in custody pursuant to the final judgment of a state court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, although it may become necessary to look behind and beyond the record of his conviction. . . .'' (p. 466.)

In *Moore* v. *Dempsey, supra,* petitioners asked for release by habeas corpus on the grounds that they had been deprived of due process of law because of mob domination of their trial. The court held that the actual facts should be examined to determine the truth of the allegations. In *Mooney* v. *Holohan, supra,* the court stated that an examination must be made of facts *outside the record* to determine whether petitioner was deprived of due process of law at his trial.

The cases of *Fiske* v. *Kansas, supra; De Jonge* v. *Oregon, supra; Norris* v. *Alabama, supra;* and *Powell* v. *Alabama, supra,* all hold that an examination should be made of the evidence introduced in the trial court whenever it is essential to a proper determination of constitutional questions. While not involving writs of habeas corpus, these cases mark the extent of the protection afforded by constitutional guaranties and are therefore applicable to habeas corpus proceedings concerned with infringement of constitutional rights. In *Norris* v. *Alabama, supra,* the court stated: ''That the question is one of fact does not relieve us of the duty to determine

whether in truth a federal right has been denied. When a federal right has been specially set up and claimed in a state court, it is our province to inquire not merely whether it was denied in express terms but also whether it was denied in substance and effect. If this requires an examination of evidence, that examination must be made. Otherwise, review by this Court would fail of its purpose in safeguarding constitutional rights."

The California cases are equally clear that on habeas corpus a court may examine the evidence introduced at the trial if necessary to determine properly the constitutional question at issue. In the case of *In re Connor, supra*, this court, following an application for a writ of habeas corpus, examined a transcript of statements made by petitioner at his arraignment to determine whether he had been deprived of his constitutional right to be represented by counsel at his trial. The court, treating the constitutional question as a jurisdictional one, stated: "Furthermore, the function of habeas corpus is to test the jurisdiction of the court to render judgment. It is not limited to the face of the proceeding, but extends to the record of the court below when necessary to determine jurisdiction." The District Court of Appeal in the case of *In re Connelly, supra*, declared: "But the respondent argues that the rule cannot be applied unless the fact of immunity appears on the face of the indictment. The argument is based upon the all-too-broad statement that the function of habeas corpus is limited to the question of jurisdiction as it appears on the face of the proceedings. The accepted rule in this state (and the only one applicable under the code sections cited above) is clearly stated in *In re Lake*, 65 Cal. App. 420, 423 [224 Pac. 126], where the court says: '. . . While neither writ [habeas corpus or certiorari] is one of error, both extend to the entire record of the court below and to the evidence itself when necessary to determine jurisdiction.'" Penal Code section 1484, moreover, provides that on habeas corpus proceedings the petitioner may "allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge. The court or judge must thereupon proceed in a summary way to hear such proof as may be produced against such imprisonment or detention, or in favor of the same, and to dispose of such party as the justice of the case may require, and have full power and authority to require and compel the attendance of witnesses, by process or

subpoena and attachment, and to do and perform all other acts and things necessary to a full and fair hearing and determination of the case.''

It is clear from the foregoing authorities that in a habeas corpus proceeding a court must look beyond the face of the record at the actual evidence when necessary to determine whether a petitioner has been deprived of constitutional rights. If the statute under which the petitioner was convicted is entirely unconstitutional, the court will discharge him on habeas corpus without examining the evidence. Conversely, if the statute is entirely constitutional, the conviction will be upheld without examination of the evidence. If, however, as in the present case, the statute is in part constitutional and in part unconstitutional and it cannot be determined from the charge and conviction whether or not petitioner was tried and convicted for violating the valid part, the court must examine the evidence, not to test whether it is sufficient to support a verdict, but to determine whether petitioner was tried and convicted for violating the invalid part alone, in which case the conviction must fall, or whether he was tried and convicted for violating the valid part as well, in which case the conviction must stand. The petitioner has the burden of proving that he was not tried and convicted for violating the valid part of the statute.

 Petitioners in the present case have failed to sustain the burden of proving that they were not tried and convicted for acts of violence since the transcripts of testimony at their trials reveal evidence of such acts. Some of the petitioners, along with 75 to 100 other men and women, were engaged in picketing the entrance to the Reed Ranch while others were in a large group picketing the entrance to the Datoni Orchard. Witnesses testified that at the Reed Ranch a large group of pickets stood in the middle of the road and refused to move when automobiles approached, thus forcing the automobiles to stop. An officer testified that he could have driven on only if he ''had wanted to kill somebody.'' Petitioners Bell, Davis and Walker participated in the stopping of cars. Bell was quoted as saying: ''We are going to stop every damned automobile that comes in here.'' Davis, according to a witness, walked up and down the middle of the road giving orders ''to stop every car that comes through here.'' Walker stated that ''he was going to stop every damn automobile and to hell with the law. He would take care of them personally.'' Some of

the automobiles were permitted to go through after having been stopped but no automobile, other than one used by officers, passed through the blockade at the Reed Ranch before the arrival of two deputy sheriffs.

The witness Newcomb testified that he was forced to stop at the Datoni Orchard about 3:10 a. m. by a large group of men standing across the road waving flashlights. They gathered about his car and ordered him to go back. A flashlight picture taken by a photographer at the scene shows seventeen men grouped about the car, eight of them directly in front of it. The photographer testified that there were about 65 men on the road and that Newcomb immediately turned around and left. Petitioners Knapp, Hamilton, Hinman, Wiseman, Day, and McKay were in this group and participated in the stopping of cars. Witnesses present at the Reed Ranch and the Datoni Orchard testified that the pickets' action caused them to fear bodily harm.

This evidence reveals conduct exceeding the bounds of peaceful picketing. Pickets may bring themselves to the notice of persons entering the picketed premises, but may not forcibly stop automobiles and intimidate the occupants by gathering in large numbers. Such action is more than peaceful persuasion. It is forceful intimidation and constitutes violence.

Because petitioners have failed to sustain the burden of proving that they were not convicted of the one valid provision of the ordinance prohibiting acts of violence, the writ heretofore issued is discharged and the petitioners are remanded to the custody of the sheriff of Yuba County.

Gibson, C. J., Shenk, J., and Houser, J., concurred.

EDMONDS, J., Concurring.—Although I agree that the petitioners are not entitled to be released upon the writ of habeas corpus, the scope of the review, in my opinion, has been extended beyond that which the law allows.

The petitioners were convicted under a complaint which charged them both in the conjunctive and disjunctive with the violation of each section of the ordinance. They now contend that, since a conviction upon charges of peaceful picketing would be an infringement of their constitutional rights, this court is not confined to the complaint and the judgment in considering the issues presented in this proceeding but

may look behind the record of conviction and examine the evidence adduced at the trial to determine whether the conviction was for acts which are included within the unconstitutional portions of the ordinance. This argument requires some consideration of the nature and function of the writ of habeas corpus.

Generally speaking, the scope of review on habeas corpus is limited to an examination of the jurisdiction of the court whose judgment of conviction is challenged. (*Ex parte Parks,* 93 U. S. 18 [23 L. Ed. 787]; *Ex parte Siebold,* 100 U. S. 371 [25 L. Ed. 717]; *Knewel* v. *Egan,* 268 U. S. 442 [45 S. Ct. 522, 69 L. Ed. 1036]; *Bowen* v. *Johnston,* 306 U. S. 19 [59 S. Ct. 442, 83 L. Ed. 455]; *Ex parte Sternes,* 77 Cal. 156 [19 Pac. 275, 11 Am. St. Rep. 251]; *Ex parte Long,* 114 Cal. 159 [45 Pac. 1057]; *In re Carpenter,* 36 Cal. App. (2d) 274 [97 Pac. (2d) 476].) The writ may not be employed as a vehicle for the correction of errors or irregularities committed within the exercise of an admitted jurisdiction. (*Ex parte Clarke,* 100 U. S. 399 [25 L. Ed. 715]; *Ex parte Siebold, supra; Johnson* v. *Zerbst,* 304 U. S. 458 [58 S. Ct. 1019, 82 L. Ed. 1461]; 13 Cal. Jur. 218.) Nor may it be used as a device to test the sufficiency of the evidence to warrant the conviction of the petitioner, a question properly addressed to a reviewing court upon appeal. (*Harlan* v. *McGourin,* 218 U. S. 442 [31 S. Ct. 44, 54 L. Ed. 1101]; *In re Jacobs,* 175 Cal. 661 [166 Pac. 801]; *In re Williams,* 183 Cal. 11 [190 Pac. 163]; *In re Stevenson,* 187 Cal. 773 [204 Pac. 216]; *Ex parte Drew,* 188 Cal. 717 [207 Pac. 249]; 13 Cal. Jur. 219.) These are traditional and fundamental principles from which there has been no departure, and although in recent times the concept of jurisdiction has been broadened upon habeas corpus, the question of the guilt or innocence of the petitioner is never a proper subject of inquiry.

Furthermore, a judgment challenged by a writ of habeas corpus carries with it a presumption of validity, and every reasonable intendment must be made in its favor. (*Johnson* v. *Zerbst, supra,* at p. 468; *In re Pillsbury,* 69 Cal. App. 784 [232 Pac. 725]; 15 Cal. Jur. 64.) The proceeding is subject to the rules applicable to collateral assault upon judgments generally. (*In re Stevenson, supra; Ex parte Stephen,* 114 Cal. 278 [46 Pac. 86].) The presumption of validity, however, is rebuttable when the jurisdiction of the convicting

court is called into question, and in pursuing its inquiry into the challenged jurisdiction, the petitioned court is not confined to the face of the judgment of conviction but may review the entire proceeding below, including an examination not only of the facts disclosed by the record but of any additional facts, outside of, but not inconsistent with, the record. (*Re Nielsen,* 131 U. S. 176 [9 S. Ct. 672, 33 L. Ed. 118]; *Re Cuddy,* 131 U. S. 280 [9 S. Ct. 703, 33 L. Ed. 154]; *In re Mayfield,* 141 U. S. 107 [11 S. Ct. 939, 35 L. Ed. 635].) However, as to all matters not affecting the jurisdiction of the court, the presumption of regularity attaching to the judgment of conviction is conclusive and unrebuttable, and any inquiry beyond the face of the judgment is foreclosed. To hold otherwise, would permit the writ of habeas corpus to be used as a means of correcting error or of testing the sufficiency of the evidence. Accordingly, the presumption that petitioners were convicted under the constitutional portions of the picketing ordinance must be deemed conclusive and an examination of the evidence upon which that conviction was had is improper unless the jurisdiction of the justice's court has been adequately challenged by the allegations of the petition.

As the courts have defined jurisdiction in recent years, it includes the right to hear and determine concerning the offense charged and the authority of the court to act in a given manner over the person of the accused. (*Fortenbury* v. *Superior Court,* 16 Cal. (2d) 405 [106 Pac. (2d) 411].) If during the course of a criminal prosecution the accused is deprived of certain fundamental procedural rights guaranteed by the Fourteenth Amendment to the Constitution of the United States, a judgment of conviction subsequently entered is invalid for lack of jurisdiction. (*Johnson* v. *Zerbst, supra; Smith* v. *O'Grady,* 312 U. S. 369 [61 S. Ct. 572, 85 L. Ed. 859]; *In re Connor,* 15 Cal. (2d) 161 [99 Pac. (2d) 248] [denial of the right to counsel]; *Frank* v. *Mangum,* 237 U. S. 309 [35 S. Ct. 582, 59 L. Ed. 969]; *Moore* v. *Dempsey,* 261 U. S. 86 [43 S. Ct. 265, 67 L. Ed. 543] [trial dominated by mob violence]; *Tumey* v. *Ohio,* 273 U. S. 510 [47 S. Ct. 437, 71 L. Ed. 749] [denial of the right to an impartial judge].) The remedy of habeas corpus is available to a petitioner asserting a lack of jurisdiction in any of the respects above set forth, and the petitioned court may look

behind the record of conviction to test the questioned jurisdiction. As stated in one of these cases: "A court's jurisdiction at the beginning of trial may be lost 'in the course of the proceedings' due to failure to complete the court—as the Sixth Amendment requires—by providing Counsel for an accused who is unable to obtain Counsel, who has not intelligently waived this constitutional guaranty, and whose life or liberty is at stake." (*Johnson* v. *Zerbst, supra.*)

But when one is being prosecuted for the commission of acts which are charged to have been committed with force and violence and also within the limits of peaceful persuasion, the court does not lose jurisdiction when it determines from the evidence that they fall within the first category and not the second. That is the situation of the petitioners in the present case. The justice's court had jurisdiction over the persons of those charged with violating the ordinance. The offense of committing acts of violence in connection with picketing is one which the court had the power to try, and a conviction for that offense was within the authority of the court to enter. The petitioners do not claim that they were not accorded a fair trial or that they were denied any rights guaranteed to them by the federal Constitution. And although the petitioner for a writ of habeas corpus is entitled to his release if the complaint upon which he was convicted does not charge a public offense (*Ex parte McNulty,* 77 Cal. 164 [19 Pac. 237, 11 Am. St. Rep. 257]; *Ex parte Williams,* 121 Cal. 328 [53 Pac. 706]), if it attempts, as here, to state an offense of which the court has jurisdiction, the question whether the facts alleged show the commission of that offense will not be inquired into. (*In re Leach,* 215 Cal. 536 [12 Pac. (2d) 3]; *In re Wood,* 194 Cal. 49 [227 Pac. 908].) When one has been convicted under a statute or ordinance constitutional in its entirety, the question whether the evidence at the trial is sufficient to bring the case within the ordinance and establish a breach of its provisions, is a question, the improper determination of which, constitutes error only and is not subject to review on habeas corpus. (*Ex parte Long,* 114 Cal. 159 [45 Pac. 1057]; *In re Kelso,* 147 Cal. 609 [82 Pac. 241, 109 Am. St. Rep. 178, 2 L. R. A. (N. S.) 796]; *In re Horr,* 177 Cal. 721 [171 Pac. 801].) This principle is applicable even though it be contended there is a total lack of evidence to support the conviction. (*In re Cutler, supra.*) No different

result should obtain when one has been convicted under a severable ordinance, constitutional in part.

In *Herndon* v. *Lowry*, 301 U. S. 242 [57 S. Ct. 732, 81 L. Ed. 1066], the facts were quite different from those now before this court. There, the defendant was convicted of the crime of insurrection as defined in a statute of Georgia. He appealed from a judgment of the state Supreme Court refusing him a discharge upon habeas corpus, contending that the statute was too vague and indefinite to provide a sufficiently ascertainable standard of guilt. The Supreme Court of the United States upheld this contention and characterized the entire statute as uncertain in that it was susceptible of a construction penalizing innocent as well as criminal conduct. In order to determine whether the state court had made an unconstitutional construction and application of the statute, the Supreme Court was compelled to examine the record and to ascertain the specific conduct which was claimed to be unlawful under the statute. This record, the court concluded, showed the commission of lawful acts only, and it held that the statute had been unconstitutionally construed and applied.

If, upon examining the face of a criminal statute, the nature of the conduct which is made unlawful appears to be wholly uncertain, the court upon habeas corpus must of necessity review the evidence concerning the acts attributed to the defendant to determine whether the statute was unconstitutionally applied. That rule is not applicable, however, where, as here, the statute prohibits acts of violence in connection with picketing, which, unquestionably, may be made unlawful. The sufficiency of the complaint to charge such acts was a question which the petitioners might properly present upon appeal, together with the point that the evidence showed no acts of violence. But their appeal has been determined adversely to them. That determination constitutes a final adjudication upon the issues of fact which, it must be conclusively presumed, was a conviction for acts of violence.

This conclusion is in accordance with long established principles. For example, in the case of *Ex parte Morrison*, 88 Cal. 112 [25 Pac. 1064], petitioner challenged the validity of a judgment convicting him of the crime of vagrancy as defined in section 647 of the Penal Code. He attacked the first clause of this section as unconstitutional. Although the judgment was regular on its face, it did not appear there-

from under which clause of section 647 the conviction was had. In discharging the writ, the court declared, "we cannot assume, for the purpose of passing on this question, or of discharging the prisoner, that this is the particular clause under which the judgment of conviction was had." And in *In re Dal Porte*, 198 Cal. 216 [244 Pac. 355], petitioner was charged and convicted under two counts, one of which stated an offense beyond the jurisdiction of the court to try. As the finding of guilt was general, it was impossible to ascertain whether the conviction was based upon either or both counts. Admitting that the judgment was erroneous and subject to correction on appeal, the court nevertheless declared: "We are not prepared to say, however, that petitioner is entitled in this proceeding to any relief from said judgment on account of its being based upon a defective count of the complaint. As we have already seen, the charge set forth in the second count of said complaint was one within the jurisdiction of said police court, and the fact that the offense charged in the first count of said complaint was one over which said police court did not have jurisdiction would not be sufficient to oust the court of jurisdiction of the offense over which it had full and complete jurisdiction."

But I agree that if the records of the trials which resulted in the petitioners' conviction may be examined for the purpose of determining whether the petitioners committed acts of violence and physical intimidation, there is substantial evidence to support the judgments which are attacked in this proceeding. For although labor may present its grievances to the public, the obstruction of access to an employer's place of business by such number of persons as to require his employees who desire to work to run the gauntlet under threats of physical harm is not protected by the constitutional guaranties.

Many years ago, this court held that an intentional interference with the relations of an employer and his employees is not tortious if the object sought to be attained has reasonable relevance to labor conditions and peaceful means are used to accomplish it. (*Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550].) That principle was recently restated and applied in holding "that workmen may associate together and exert various forms of economic pressure upon

employers, provided they act peaceably and honestly." However, the court laid particular emphasis upon the requirement that labor's acts must be peaceful if they are to come within the protection of the law. Fully recognizing "that the right to picket peacefully and truthfully is one of organized labor's lawful means of advertising its grievances to the public, and as such is guaranteed by the Constitution as an incident of freedom of speech," it also added: "But the law clearly requires that concerted action by union workers must be peaceful. Acts of violence or 'acts amounting to physical intimidation' will be enjoined." (*McKay* v. *Retail Auto S. L. Union No. 1067*, 16 Cal. (2d) 311 [106 Pac. (2d) 373].)

The testimony which is referred to in the opinion of my associates, and other evidence which is shown by the record, fully justifies a conclusion that the picketing, carried on, in part, under cover of darkness and with a show of force toward employees of the Earl Fruit Co. who desired to continue their employment entirely out of proportion to any peaceful purpose, was accompanied by such violence, or threats of violence, as to constitute unlawful means. To say that it comes within the bounds of peaceful picketing is to ignore the realities of the situation.

When pickets patrol the public street which is the approach to their employer's premises and either their number or their conduct is such as to constitute intimidation and put employees or others in fear of bodily harm, they are guilty of unlawful acts. Such picketing goes far beyond that which has been recognized by the courts as a reasonable. exercise of the right to tell the facts of a labor dispute and to persuade employees, by peaceful means, to leave their work. The courts have generally recognized that persuasion in the presence of a large number of persons is not peaceful persuasion, and in one of its decisions, the Supreme Court of the United States said that it is the proper function of a court of equity "to prevent the inevitable intimidation of . . . groups of pickets, but to allow missionaries. . . . In going to and from work, men have a right to as free passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege." (*American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184 [42 S. Ct. 72, 66 L. Ed. 189].)

In the very recent case of *Milk Wagon Drivers Union of Chicago, Local 753* v. *Meadowmoor Dairies*, 312 U. S. 287

[61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200], (rehearing denied, 312 U. S. 715 [61 S. Ct. 803, 85 L. Ed. 1145]), the same court laid down the requirement that, to be lawful, picketing must be peaceful and may not have a background of violence. "Peaceful picketing," said the court, "is the workingman's means of communication. It must never be forgotten, however, that the Bill of Rights was the child of the Enlightenment. Back of the guarantee of free speech lay faith in the power of an appeal to reason by all the peaceful means for gaining access to the mind. It was in order to avert force and explosions due to restrictions upon rational modes of communication that the guarantee of free speech was given a generous scope. But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution."

The petitioners in that case, as in the one now before this court, relied upon the decision of *Thornhill* v. *Alabama,* 310 U. S. 88, 105 [60 S. Ct. 736, 84 L. Ed. 1093]. But, as Mr. Justice Frankfurter pointed out, there was no "entanglement with violence" in either the Thornhill case or in *Carlson* v. *California,* 310 U. S. 106 [60 S. Ct. 746, 84 L. Ed. 1104], where the court declared: "The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted." Concerning the former case, he said that the court expressly excluded a labor dispute involving violence from the scope of its decision in these words: "We are not now concerned with picketing en masse or otherwise conducted which might occasion such imminent and aggravated danger . . . as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger." The Yuba County ordinance, in so far as its valid severable provisions are concerned, is exactly such a statute.

Curtis, J., concurred.

CARTER, J., dissenting.—I dissent.

In my opinion petitioners are entitled to their release on habeas corpus upon the ground that the provisions of the ordinance under which they were charged and convicted are unconstitutional and void.

Since the majority of the court seem to agree that section 2 of the ordinance is invalid, but sustain the validity of the

judgment of conviction against the petitioners under section 3 of said ordinance, I will confine my discussion to section 3 only.

Said section provides: "Section 3. It is unlawful for any person to beset or picket the premises of another, or any approach thereto, where any person is employed or seeks employment, or any place or approach thereto where such employee or person seeking employment lodges or resides, for the purpose of inducing such employee or person seeking employment, by means of compulsion, coercion, intimidation, threats, acts of violence, or fear, to quit his or her employment or to refrain from seeking or freely entering into employment."

In my opinion the above-quoted section is so vague, indefinite and uncertain that it cannot be said to denounce as a crime any act which may be proscribed under the police power of the state, and fails to provide a sufficiently ascertainable standard of guilt.

Before making an analysis of the above-quoted section, I shall call attention to certain rules applicable to the interpretation of statutes and ordinances. They are as follows:

"When the language of an act appears on its face to have a meaning, but it is impossible to give it any precise or intelligible application in the circumstances under which it was intended to operate, it is simply void; for if no judicial certainty can be settled upon as to its meaning, courts are not at liberty to supply the deficiency or make the statute certain. But legislation cannot be nullified on the ground of uncertainty, if susceptible of any reasonable construction that will support it." (26 Am. and Eng. Ency. Law, 2d Ed., 656.)

"Where the statutory terms are of such uncertain meaning, or so confused, that the courts cannot discern with reasonable certainty what is intended, they will pronounce the enactment void." (Statutory Crimes, 3d Ed., in the third subdivision of section 41.)

"Statutes and ordinances which fix crimes, or quasi crimes, should so fix them that there could be no uncertainty. They should be so worded that one could read them, and know whether or not he was violating law. They should not be so worded as to leave their substantive elements to the caprices of either judge or jury. In other words the law should be complete and definite. What would be 'reasonable effort' under this law is left a question for the court or jury. What

in the minds of one court or jury might be 'reasonable effort' might not be so considered by another court or jury. Each trial tribunal would be making its own ordinance. This will not do for a law or ordinance criminal in character." (*Taft v. Shaw,* 284 Mo. 531 [225 S. W. 457].)

"It is equally true that a mere collection of words can not constitute a law; otherwise the dictionary can be transformed into a statute by the proper legislative formula. An act of the legislature, to be enforceable as a law, must prescribe a rule of action, and such rule must be intelligibly expressed." (*State ex inf. Crow* v. *West Side Street Ry. Co.,* 146 Mo. 155 [47 S. W. 959].)

"An ordinance of a regulatory nature must be clear, certain and definite, so that the average man may with due care after reading the same understand whether he will incur a penalty for his actions or not." (19 R. C. L., p. 810.)

". . . in creating an offence the legislature may define it by a particular description of the act or acts constituting it, or may define it as any act which produces, or is reasonably calculated to produce certain defined or described results." (8 R. C. L., p. 57.)

Applying the foregoing rules to the ordinance under consideration, it is clear to my mind that the language contained therein is insufficient to charge an offense within the purview of the police power of the state in view of the recent decisions of the Supreme Court of the United States holding that "The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a state. . . ." (*Thornhill* v. *Alabama,* 310 U. S. 88 [60 S. Ct. 736, 84 L. Ed. 1093]; *Carlson* v. *California,* 310 U. S. 106 [60 S. Ct. 746, 84 L. Ed. 1104]; *Lovell* v. *Griffin,* 303 U. S. 444 [58 S. Ct. 666, 82 L. Ed. 949]; *Schneider* v. *State,* 308 U. S. 147 [60 S. Ct. 146, 84 L. Ed. 155]; *Gitlow* v. *New York,* 268 U. S. 652, 666 [45 S. Ct. 625, 69 L. Ed. 1138, 1145]; *Stromberg* v. *California,* 283 U. S. 359, 368 [51 S. Ct. 532, 75 L. Ed. 1117, 1121, 73 A. L. R. 1484]; *Near* v. *Minnesota,* 283 U. S. 697, 707 [51 S. Ct. 625, 75 L. Ed. 1357, 1362]; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 [56 S. Ct. 444, 80 L. Ed. 660, 665]; *De Jonge* v. *Oregon,* 299 U. S. 353, 364 [57 S. Ct. 255, 81 L. Ed. 278, 283]. See, also, *Palko* v.

*Connecticut,* decided December 6, 1937 [302 U. S. 319, 58 S. Ct. 149, 82 L. Ed. 288].) It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the amendment. (*Raymond* v. *Chicago Union Traction Co.,* 207 U. S. 20 [28 S. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757] ; *Home Teleph. & Teleg. Co.* v. *Los Angeles,* 227 U. S. 278 [33 S. Ct. 312, 57 L. Ed. 510] ; *Cuyahoga River Power Co.* v. *Akron,* 240 U. S. 462 [36 S. Ct. 402, 60 L. Ed. 743].)

The terms, ''beset or picket'' are not defined in the ordinance here under consideration nor in any statute or court decision of this state. (*Carlson* v. *California, supra.*) Textwriters have defined picketing as ''the marching to and fro before the premises of an establishment involved in a dispute, generally accompanied by the carrying and display of a sign, placard or banner bearing statements in connection with the dispute.'' (Section 109 Labor Disputes and Collective Bargaining by Ludwig Teller.) Picketing has also been defined by legislative enactment elsewhere as ''the act of walking up and down before any place of business . . . and the solicitation of the public or employees through word of mouth or by printed signs or banners, that such place of business is unfair to organized labor or to any voluntary association, group or members of labor organizations; and by requesting through word of mouth or signs that such place of business or employer be boycotted and not patronized by the public; and by personal solicitation through word of mouth or signs that employees . . . cease working in such place of business so picketed.'' (*Diemer* v. *Weiss,* 343 (Mo.) 626 [122 S. W. (2d) 922].) In brief terms, picketing may be said to constitute the dissemination of information concerning the facts of a labor dispute by representatives of organized labor in the vicinity of the place where the dispute exists. (*Thornhill* v. *Alabama, supra.*)

It now appears to be well settled by both the decisions of this court and those of the Supreme Court of the United States that ''the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.'' (*Thornhill* v. *Alabama, supra; Carlson* v. *California, supra; Hague* v. *C. I. O.,* 307 U. S. 496 [59 S. Ct. 954, 83 L. Ed. 1423] ; *Schneider* v. *State, supra; Senn* v. *Tile Layers Protective Union,* 301 U. S. 468 [57 S. Ct. 857, 81 L. Ed. 1229].)

Applying the foregoing definition to section 3 of the ordinance under consideration here, we find that the ordinance makes it "unlawful for any person to . . . picket the premises of another . . . for the purpose of inducing any employee or person seeking employment . . . to quit his or her employment or to refrain from seeking or freely entering into employment."

It appears to be conceded that a statutory enactment couched in the above-quoted language would constitute a clear violation of the constitutional provisions both of this state and of the United States guaranteeing such civil liberties as freedom of speech, freedom of press and freedom of assembly. (*Thornhill* v. *Alabama, supra; Carlson* v. *California, supra; Lovell* v. *Griffin, supra; Schneider* v. *State, supra.*)

But it is insisted that the insertion of the words "by means of compulsion, coercion, intimidation, threats, acts of violence, or fear," after the clause "for the purpose of inducing such employee or person seeking employment," and before the clause "to quit his or her employment or to refrain from seeking or freely entering into employment" removes section 3 of said ordinance from the category of unconstitutional legislation and renders it a valid enactment prohibiting all picketing where some of the pickets in some manner or other resort to what might be construed to mean "compulsion, coercion, intimidation, threats, acts of violence, or fear." In view of this argument, let us analyze the last quoted terms and see if they have any significance whatever when used in an ordinance designed to proscribe and prohibit acts and conduct which may be performed in the exercise of one's civil liberties guaranteed by both our state and federal Constitutions.

If picketing constitutes the publicizing of the facts concerning a labor dispute in the vicinity of the premises where said dispute exists, then it must follow that it was the intention of the legislative body which enacted said ordinance to prohibit the dissemination of information concerning such labor dispute by means of "compulsion," etc.

In my opinion this is the only interpretation or construction which can be placed upon the above-quoted language of section 3 of said ordinance and said language is thereby rendered meaningless. To illustrate, how can it be said that a picket disseminated information concerning the facts of a labor dispute by means of "compulsion," or "coercion," or

"intimidation," or "threats," or "acts of violence," or "fear"? Certainly the dissemination of information by means of either the spoken or printed word regardless of how loud the voice or how large the printing would not have the effect of creating or bringing about the conditions described as "compulsion, coercion, intimidation, threats, acts of violence, or fear." At least, it is not possible for me to imagine a situation in which one engaged in picketing in the sense that that term has been defined, doing anything as a picket which would bring about a condition approaching "compulsion, coercion, intimidation, threats, acts of violence, or fear." Picketing does not mean throwing stones, but a person engaged in picketing may throw stones; picketing does not mean wielding clubs, but a person engaged in picketing may wield a club; picketing does not mean firing guns, but a person engaged in picketing may fire a gun; in brief, picketing does not mean or comprehend the commission of any act or acts of violence, but such acts may be committed by those engaged in picketing. It must be conceded that every act of violence designed to injure the person or property of another now constitutes a violation of some penal provision of the law of this state and subjects the perpetrator thereof to prosecution and punishment, whether committed by a person engaged in picketing or in any other activity. There is no more reason for saying that publicizing the facts of a labor dispute, or the dissemination of information concerning the facts of a labor dispute through pickets, may be accomplished by means of acts of violence, than to say that preaching the gospel, lecturing on social reforms, teaching political economy or publishing a newspaper may be likewise accomplished. The fact that acts of violence may be committed by one engaged in any of the above pursuits does not change the character of the pursuit nor subject it to restrictions created by legislative enactments under an asserted exercise of the police power. In other words, it is the acts of violence which come within the purview of the police power and not the picketing, preaching, lecturing, teaching or publishing, because acts of violence have no relation to the purpose and object to be accomplished by any of the above-mentioned activities, including picketing, according to the accepted definition of that word. It may be true that a person while engaged in picketing might commit any and every crime known to our law, but certainly the

commission of such crimes should not be charged up against the entire picket line or the labor organization under whose auspices the premises are being picketed. As I read our penal statutes, I cannot think of anything in the nature of violence, threats of violence, or acts of violence which are not now denounced as public offenses and punishable as such. Therefore, to enact an ordinance denouncing the dissemination of information concerning the facts of a labor dispute by means of acts of violence, places such ordinance in the category of those denounced by the above-quoted rules as being so vague, indefinite and uncertain that they are absolutely meaningless. Such, in my opinion, is the situation with reference to section 3 of the ordinance here under consideration. To carry the discussion a little further in order to disclose the absurdity of the contention that since section 3 of said ordinance prohibits "picketing by means of acts of violence" it is a valid exercise of the police power of the state, let us assume that the ordinance denounced as a crime any of the following: "preaching by means of acts of violence"; or "lecturing by means of acts of violence"; or "teaching by means of acts of violence"; or "publishing a newspaper by means of acts of violence"; or "distributing a newspaper by means of acts of violence"; or "parading by means of acts of violence." Obviously, any such ordinance would be declared void on its face as being too vague, uncertain and indefinite to constitute a public offense. The Supreme Court of Missouri by unanimous opinion in the case of *Deimer* v. *Weiss, supra,* declared a similar ordinance void for uncertainty, and I have not been able to find respectable authority to the contrary.

The ordinance here under consideration falls squarely within the rule announced by the Supreme Court of the United States in the case of *Herndon* v. *Lowry,* 301 U. S. 242 [57 S. Ct. 732, 81 L. Ed. 1066], where a statute of the state of Georgia purporting to prohibit acts and conduct tending to incite insurrection was under attack. It appears from the opinion in that case that "The petition alleged the judgment and sentence were void and appellant's detention illegal because the statute under which he was convicted denies and illegally restrains his freedom of speech and of assembly and is too vague and indefinite to provide a *sufficiently ascertainable standard of guilt,* and further alleged that there had been no adjudication by any court of the constitutional valid-

ity of the statute as applied to appellant's conduct." (Emphasis added.) The court at page 255 of its opinion said:

"The affirmance of conviction upon the trial record necessarily gives § 56 the construction that one who seeks members for or attempts to organize a local unit of a party which has the purposes and objects disclosed by the documents in evidence may be found guilty of an attempt to incite insurrection.

"The questions are whether this construction and application of the statute deprives the accused of the right of freedom of speech and of assembly guaranteed by the Fourteenth Amendment, and whether the statute so construed and applied furnishes *a reasonably definite and ascertainable standdard of guilt."* (Emphasis added.)

On page 263 of its opinion in the Herndon case the court quotes with approval from its decision in *United States* v. *L. Cohen Grocery Co.,* 255 U. S. at page 81 [41 S. Ct. 298, 65 L. Ed. 516], the following pertinent declaration:

" 'Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, we see no reason to doubt the soundness of the observation of the court below, in its opinion, to the effect that, to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury . . .' (p. 89.) "

The court then concluded:

"The decisions relied on by the State held the Sherman Law furnished a reasonable standard of guilt because it made a standard long recognized by the common law the statutory test.

"The statute, as construed and applied, amounts merely to a dragnet which may enmesh anyone who agitates for a change of government if a jury can be persuaded that he ought to have foreseen his words would have some effect in the future conduct of others. *No reasonably ascertainable standard of guilt is prescribed.* So vague and indeterminate

are the boundaries thus set to the freedom of speech and assembly that the law necessarily violates the guarantees of liberty embodied in the Fourteenth Amendment." (Italics added.)

What is the ascertainable standard of guilt prescribed in the ordinance here under consideration? The obvious answer to this question must be that it contains no such standard. The statement therein that "it shall be unlawful" to commit an "act of violence" amounts to nothing more than to say that "it is unlawful to do an unlawful act" without defining what constitutes the unlawful act. Nowhere in the ordinance is there any indication of what is meant by the expression "It is unlawful for any person to beset or picket the premises of another . . . for the purpose of inducing such employee or person seeking employment, *by means* of *compulsion, coercion, intimidation, threats, acts of violence,* or *fear,* to quit his or her employment or to refrain from seeking or freely entering into employment." It is obvious that if we apply the accepted definition of the word "picket" (to disseminate information concerning or to publicize the facts of a labor dispute) the italicized words become meaningless and no crime is defined.

The Supreme Court of the United States in the case of *Thornhill* v. *Alabama, supra,* in commenting upon similar broad and sweeping provisions of an Alabama statute, made the following comment:

"The numerous forms of conduct proscribed by section 3448 are subsumed under two offenses: the first embraces the activities of all who 'without just cause or legal excuse' 'go near to or loiter about the premises' of any person engaged in a lawful business for the purpose of influencing or inducing others to adopt any of certain enumerated courses of action; the second, all who 'picket' the place of business of any such person 'for the purpose of hindering, delaying or interfering with or injuring any lawful business or enterprise of another.' It is apparent that one or the other of the offenses comprehends every practicable method whereby the facts of a labor dispute may be publicized in the vicinity of the place of business of an employer. The phrase 'without just cause or legal excuse' does not in any effective manner restrict the breadth of the regulation; the words themselves have no ascertainable meaning either inherent or historical. Compare

*Lanzetta* v. *New Jersey*, 306 U. S. 451, 453-455 [59 S. Ct. 618, 83 L. Ed. 888]. The courses of action, listed under the first offense, which an accused—including an employee—may not urge others to take, comprehends those which in many instances would normally result from merely publicizing, without annoyance or threat of any kind, the facts of a labor dispute. An intention to hinder, delay or interfere with a lawful business, which is an element of the second offense, likewise can be proved merely by showing that others reacted in a way normally expectable of some upon learning the facts of a dispute. *The vague contours of the term 'picket' are nowhere delineated.* Employees or others, accordingly, may be found to be within the purview of the term and convicted for engaging in activities identical with those proscribed by the first offense. In sum, whatever the means used to publicize the facts of a labor dispute, whether by printed sign, by pamphlet, by word of mouth or otherwise, all such activity without exception is within the inclusive prohibition of the statute so long as it occurs in the vicinity of the scene of the dispute.'' (Italics added.)

Likewise, in the case of *Carlson* v. *California, supra,* the Supreme Court of the United States in striking down as unconstitutional and void an ordinance of Shasta County, California, similar to the ordinance here under consideration because of its *''sweeping and inexact terms,''* made this very pertinent declaration:

''The sweeping and inexact terms of the ordinance disclose the threat to freedom of speech inherent in its existence. It cannot be thought to differ in any material respect from the statute held void in Thornhill's case. The carrying of signs and banners, no less than the raising of a flag, is a natural and appropriate means of conveying information on matters of public concern. (*Stromberg* v. *California,* 283 U. S. 359 [51 S. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484].) For the reasons set forth in our opinion in *Thornhill* v. *Alabama, supra,* publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgement by a state.''

In reviewing the decisions of the Supreme Court of the United States in connection with my study of the case at bar

and the preparation of this opinion, I have been strongly impressed with the decided liberal trend of the decisions of that great court, which in its pronouncements in the field of those fundamental and basic personal rights and liberties referred to as civil liberties, have exemplified profound vision and foresight and eminent fairness in extending the constitutional guaranties of freedom of speech and of the press not only the strong, the wealthy and the powerful, but likewise the weak, the humble and the oppressed. It is these pronouncements which will protect a defenseless minority from being legislated against and their freedom of expression curtailed by those who happen to be in the majority or who control the legislative processes for the time being. Such a situation was depicted by Mr. Justice Murphy in speaking for the Supreme Court of the United States in the case of *Thornhill* v. *Alabama, supra,* when he said:

"A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. *The existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview.* It is not any less effective or, if the restraint is not permissible, less pernicious than the restraint on freedom of discussion imposed by the threat of censorship. An accused, after arrest and conviction under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. (*Schneider* v. *State,* 308 U. S. 147, 155, 162, 163 [60 S. Ct. 146, 84 L. Ed. 155].) Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression. (*Stromberg* v. *California,* 283 U. S. 359, 368 [51 S. Ct. 532, 75 L. Ed. 1117, 73 A. L. R. 1484]; *Schneider* v. *State,* 308 U. S. 147, 155, 162, 163 [60 S. Ct. 146, 84 L. Ed. 155].) Compare

*Lanzetta* v. *New Jersey,* 306 U. S. 451 [59 S. Ct. 618, 83 L. Ed. 888].'' (Emphasis added.)

So zealously has the Supreme Court of the United States guarded and protected these fundamental personal rights and liberties that in the case of *Schneider* v. *State, supra,* that court struck down as unconstitutional and void four ordinances enacted respectively by the cities of Los Angeles, California, Milwaukee, Wisconsin, Worcester, Massachusetts, and Irvington, New Jersey, designed to prohibit the distribution of handbills, leaflets, circulars, etc., in said cities. Mr. Justice Roberts, speaking for the court in said case, declared:

''It is argued that the circumstance that in the actual enforcement of the Milwaukee ordinance the distributor is arrested only if those who receive the literature throw it in the streets, renders it valid. But, even as thus construed, the ordinance cannot be enforced without unconstitutionally abridging the liberty of free speech. As we have pointed out, the public convenience in respect of cleanliness of the streets does not justify an exertion of the police power which invades the free communication of information and opinion secured by the Constitution.

''It is suggested that the Los Angeles and Worcester ordinances are valid because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places. But, as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.

''The freedom of speech and of the press secured by the First Amendment against abridgment by the United States is similarly secured to all persons by the Fourteenth Amendment against abridgment by a state.

''Although a municipality may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion. . . .

''This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not lightly used. It reflects the belief of the framers of the Constitution that

exercise of the rights lies at the foundation of free government by free men. It stresses, as do many opinions of this court, the importance of preventing the restriction of enjoyment of these liberties.

"In every case, therefore, where legislative abridgment of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

The chief contention of the prosecuting officers in the case at bar is that the ordinance here in question may be upheld as a valid exercise of police power. While the realm within which the police power operates may be somewhat indefinite, it may not be invoked to abridge the fundamental right of freedom of expression guaranteed by constitutional mandate. The Constitution is the bulwark of our civil liberty and it should be so construed as to protect that liberty against encroachment even under the guise of the police power. While some of its provisions have at times been emasculated by enthusiastic advocates of the police power doctrine, the Constitution still remains the fundamental law of the land and will continue to be such so long as the ideal of civil liberty is predominate in the hearts and minds of the American people.

In my opinion, the ordinance here in question trenches upon the right of free expression guaranteed by both our state and federal Constitutions, and should therefore be stricken down. If "picketing" means "the dissemination of information concerning the facts of a labor dispute," then the right to picket, as well as the right to preach, lecture, teach, or publish a newspaper, all fall in the same category. If the Constitution protects one of these rights, it protects the others. If a crime is committed by a person while exercising one or more of these rights, he may be prosecuted, convicted and punished for the crime, not for the exercise of the right to picket, preach, lecture, teach, or publish a newspaper. In my opinion, any legislative enactment designed to abridge or limit any of the above-mentioned rights flies squarely in the face of the con-

stitutional guarantee of freedom of speech and press, and should be declared null and void by the courts under their constitutional power.

From what I have said in the foregoing opinion, it is obvious that section 3 as well as section 2 of the ordinance here under consideration is void, and there can be no doubt but that habeas corpus is the only remedy available to petitioners to test the validity of said ordinance. (See cases collected and commented on in 13 Cal. Jur. p. 225, sec. 8.)

In view of my determination that the ordinance is invalid and void because the language employed therein is too vague, uncertain and indefinite to provide a sufficiently ascertainable standard of guilt and that the acts denounced by it cannot be proscribed because they are not within the purview of the police power of the state, the complaint therefore fails to charge a public offense, and it is unnecessary to review the evidence presented during the trial in the justice's court.

The majority opinions in this case are predicated upon the theory that since section 3 of the ordinance in question purports to prohibit "picketing by means of acts of violence" (whatever this phrase means), it defines a crime within the purview of the police power of the county of Yuba, and notwithstanding the defendants were found guilty of violating all of the provisions of both sections 2 and 3 of the ordinance (a portion of the charge being based on obviously invalid provisions of the ordinance), the judgment against them is nevertheless immune from attack on habeas corpus.

I am of the opinion, that even if it can be said that section 3 of the ordinance sufficiently defines a crime as held by a majority of the court, the conviction of the defendants should not be allowed to stand for the reason that the complaint which forms the basis of the prosecution is wholly insufficient to charge a public offense, and the judgment against petitioners is void for the reason that they were found guilty of the commission of lawful as well as unlawful acts.

Section 3 of the ordinance in question makes unlawful, "picketing by means of compulsion, coercion, intimidation, threats, acts of violence, or fear." All of these means, except "acts of violence" may be resorted to by those who are peacefully and therefore lawfully engaged in publicizing a labor dispute by means of picketing or boycotting.

That there is such a thing as moral compulsion, coercion, intimidation, threats, and fear is a proposition recognized in

experience and by many court decisions, and in my opinion, these words do not necessarily imply conduct of an unlawful character when applied to a labor dispute. Such words may be used to define the usual, ordinary and customary moral, social and economic pressure which inheres in every labor dispute and particularly where picketing is resorted to.

It must be conceded that it is within the constitutional right of a person engaged in a labor dispute to advise those who contemplate crossing a picket line, that if they do so, future social or business relations with them will be withheld. It must also be conceded that such advice constitutes a threat, and it also amounts to compulsion, intimidation and coercion. Such compulsion, intimidation and coercion is the result of fear of the withholding of such social or business relations which may have been both pleasant and profitable to the person who is threatened with the loss thereof. Obviously, conduct constituting such threats, compulsion, intimidation, coercion or fear cannot be proscribed by penal statute or ordinance for the reason that the same would constitute a violation of the constitutional guarantee of free speech.

Webster's New International Dictionary, Second Edition, defines ''compulsion'' as follows:

''1. Act of compelling, or state of being compelled; act of driving or urging by force or by physical or moral constraint; subjection to force. Cf. Coercion.

''I would give no man a reason upon compulsion.''

''2. Anything that compels; as, to live under compulsion.''

The same work defines ''coercion'' as follows:

''1. The act, process, or power of coercing; specif., the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done; compulsion. Coercion may cause the act produced to be a nullity so far as concerns legal ability. Cf. Duress.

''2. The application of legal or governmental measures to a group or nation, so as to bring its outward conformity.''

And ''intimidation'' is defined by the same work as follows:

''To make timid or fearful; to inspire or affect with fear; to make fearful; to frighten; specif., to deter, as by threats; to overawe; cow.

''Now guilt, once harbored in a conscious breast,

''Intimidates the brave, degrades the great. Johnson.

''Syn.—Terrify, daunt, deter, abash. See Frighten.

"Ant.—Embolden, hearten, inspirit. See Encourage.

"Act of making timid or fearful or of deterring by threats; state of being intimidated, as the voters were kept from the polls by intimidation."

It will be observed from the foregoing definitions that the mere assertion that compulsion, coercion or intimidation has been used or resorted to for the accomplishment of an object or purpose or in the performance of an act, it does not necessarily follow therefrom that the means employed was unlawful, immoral or unjust. In fact, it is inconceivable that a labor dispute could result in a strike, and that striking employees and their sympathizers could picket and boycott places of business, without the owners, employees or patrons of such places of business being subjected to some degree of moral, social or economic compulsion, coercion or intimidation. It appears to be settled beyond any question by the authorities which I have cited above, and by many other authorities both in this and other jurisdictions, that the moral, social and economic compulsion, coercion and intimidation which may be occasioned as the result of peaceful picketing, boycotting and publicizing of labor disputes, cannot be proscribed by statute or prohibited by injunction because such conduct is permissible as a lawful exercise of the constitutional right of free speech, free press and free assemblage.

What is said with reference to the meaning of the words "compulsion," "coercion" and "intimidation" when applied to peaceful picketing and boycotting, is equally true with reference to the word "threat." It cannot be denied that a person has the right to threaten that which he has a lawful right to do, and that such threat cannot be proscribed by statute or ordinance, or prohibited by injunction. The late Mr. Justice Holmes, while a member of the Supreme Judicial Court of Massachusetts, in the case of *Vegelahn* v. *Gunther*, 167 Mass. 92 [44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722], made this observation in one of his history-making dissenting opinions. He said:

"I pause here to remark that the word 'threats' often is used as if, when it appeared that threats had been made, it appeared that unlawful conduct had begun. But it depends on what you threaten. As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do—that is, give warning of your intention to do—

in that event, and thus allow the other person the chance of avoiding the consequence. So as to 'compulsion,' it depends on how you 'compel' . . . So as to 'annoyance' or 'intimidation.' ''

In the case of *Lisse* v. *Local Union No. 31,* 2 Cal. (2d) 312 [41 Pac. (2d) 314], at page 318, this court quoted with approval from its decision in the case of *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324], as follows:

'' 'The right of united labor to strike, in furtherance of trade interests (no contractual obligation standing in the way) is fully recognized. The reason for the strike may be based upon the refusal to comply with the employees' demand for the betterment of wages, conditions, hours of labor, in the discharge of one employee, or the engagement of another—in brief, in any one or more of the multifarious considerations which in good faith may be believed to tend toward the advancement of the employees. After striking, the employees may engage in a boycott, as that word is here employed. As here employed it means not only the right to the concerted withdrawal of social and business intercourse, but the right by all legitimate means—of fair publication, and fair oral or written persuasion, to induce others interested in or sympathetic with their cause, to withdraw their social intercourse and business patronage from the employer. *They may go even further than this, and request of another that he withdraw his patronage from the employer, and may use the moral intimidation and coercion of threatening a like boycott against him if he refuse so to do.* This last proposition necessarily involves the bringing into a labor dispute between A and B, C, who has no difference with either. It contemplates that C, upon the request of B, and under the moral intimidation lest B boycott him, may thus be constrained to withdraw his patronage from A, with whom he has no controversy.'' (Emphasis added.)

In the case of *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, 610 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550], Mr. Justice Sloss in his concurring opinion quoted with approval from the dissenting opinion of the late Mr. Justice Holmes, in the case of *Vegelahn* v. *Gunther, supra,* as follows:

'' 'If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the

greatest possible return, it must be true that when combined they have the same liberty that combined capital has to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control.'

"The terms 'intimidation' and 'coercion,' so frequently used in the discussion of this question, seem to me to have no application to such acts as were here committed. One cannot be said to be 'intimidated' or 'coerced,' in the sense of unlawful compulsion, by being induced to forego business relations with A, rather than lose the benefit of more profitable relations with B. It is equally beside the question to speak of 'threats,' where that which is threatened is only what the party has a legal right to do."

The Supreme Court of Indiana, in the case of *Local Union No. 26 etc.* v. *City of Kokomo*, 211 Ind. 72 [5 N. E. (2d) 624, at page 628, 108 A. L. R. 1111], discusses the meaning of the words "compulsion" and "coercion" in relation to a labor dispute in the following language:

"The city ordinance now before the court makes all picketing of the employer's premises, or the approach thereto, unlawful. No force or violence is necessary to make the act of picketing unlawful and punishable. Peaceable acts upon the part of the employees are authorized expressly by chapter 12 of the Acts of 1933. The allegations of the complaint show no acts involving fraud or violence. The 1933 act authorizes the doing of all acts alleged in the complaint, which alleges that such acts were performed by lawful means and without fraud or violence, or any intention or purpose to injure the employer. The act of striking or picketing necessarily involves compulsion and coercion, and unless the same is performed by acts of fraud or violence, is lawful and permissible under the statute.

"The act of picketing is a means of 'compulsion and coercion,' but if it is exercised in a legal manner, and without fraud or violence, it is lawful under the statute, yet it is the clear intention of the ordinance to prevent such acts. The overt act of assembling and congregating for concerted action in a peaceable, lawful manner is made punishable by the ordinance. The ordinance is repugnant to the declared purpose and object of the statute."

I think the foregoing authorities clearly hold that to some extent moral, social and economic compulsion, coercion and

intimidation inheres in every labor dispute where picketing and boycotting is resorted to by striking employees and their sympathizers, and that such compulsion, coercion and intimidation, so long as it is exercised without fraud, force or violence, does not transcend the realm of peaceful picketing, and cannot be proscribed by statute or ordinance. This conclusion is sustained by the trend of recent decisions, particularly those of the Supreme Court of the United States, which I have cited herein. The clear purport of these decisions is to the effect that any statute or ordinance which proscribes or prohibits peaceful picketing is in clear violation of the Fourteenth Amendment to the Constitution of the United States.

Of course, it is elementary that a person engaged in picketing is amenable to all of our penal statutes denouncing as crimes all acts of force, violence, menacing threats, riots, routs, disturbing of the peace, unlawful assembly, assault and battery, etc., and my attention has not been called to any acts which one engaged in picketing might perpetrate in violation of the civil rights of another, or inimical to public peace and safety, which are not now denounced as crimes by the penal statutes of this state and punishable as such.

The complaint against petitioners follows the language of the ordinance and the petitioners were charged as follows:

"That on or about the 9th day of July, 1939, and within the limits of the County of Yuba, in the State of California, said defendants did then and there wilfully and unlawfully beset and/or picket the premises and/or the approach thereto of another, to-wit, the Earl Fruit Company located approximately seven miles southwest of the City of Marysville, in the County of Yuba, State of California, and commonly known as the New England Ranch where persons were employed and/or sought employment, for the purpose of inducing such employees and/or persons seeking employment by means of compulsion, and/or coercion and/or intimidation and/or threats and/or acts of violence and/or to quit his or her employment and/or to refrain from seeking or freely entering into said employment."

It appears to be well settled that where a statute is so framed that lawful as well as unlawful acts may be punished under it, a complaint charging a violation of the law must specifically set out the alleged unlawful conduct of the accused, and negative lawful conduct on his part. Otherwise, a complaint under such a law fails to charge a public offense,

which is the situation we have in the case at bar. (*Ex parte Peterson,* 119 Cal. 578 [51 Pac. 859] ; *Ex parte McLaughlin,* 16 Cal. App. 270 [116 Pac. 684] ; *In re Hernandez,* 64 Cal. App. 71 [220 Pac. 423].)

Tested by the rule announced in the foregoing authorities, the complaint in the case at bar was clearly insufficient to charge the petitioners with the commission of a public offense. As I have heretofore pointed out, the ordinance is clearly invalid in so far as it purports to denounce as a public offense picketing by means of compulsion, coercion, or intimidation as such words are defined in the authorities relating to picketing cases. Such being the case, the complaint against petitioners charges them with the doing of lawful as well as unlawful acts, and is therefore insufficient to charge a public offense and is insufficient to support a judgment of conviction against petitioners for a violation of section 3 of said ordinance.

Furthermore, the complaint in the case at bar charges both in the conjunctive and disjunctive the violation of every act denounced by section 3 of the ordinance. This method of pleading is clearly improper. It is impossible to determine from such a complaint what specific acts or conduct of the defendants the prosecution intends to prove for the purpose of establishing their guilt. Under the complaint in this case, the defendants could have been found guilty of a violation of section 3 of said ordinance if they did nothing more than stand on the side of the road peacefully holding a piece of cardboard in their hands containing a statement that a labor dispute was in progress on the adjacent premises. Such a complaint is clearly insufficient to charge a public offense, and may be tested on habeas corpus. (*Ex parte Greenall,* 153 Cal. 767 [96 Pac. 804] ; *In re Ah Sing,* 156 Cal. 349 [104 Pac. 448].)

The trial court made no attempt to segregate the charges in the complaint charging an alleged unlawful offense from those charging the commission of purely lawful acts. This is demonstrated not only by the allegations of the petition, but also by those of the return. Both allege that the jury found the defendants guilty "as charged in the complaint," and that the sentence imposed was imposed "on said conviction." I think it is clear that such a complaint could not authorize the trial court to try the accused for acts which are lawful, nor

could it confer jurisdiction on the trial court to convict the accused for the doing of lawful acts, and to sentence them for the doing of such lawful acts. That is exactly what was done in the instant case. The defendants were found guilty "as charged in the complaint" and sentence was imposed "on said conviction." That means that the jury found that the defendants were guilty of all the "offenses" charged in the complaint, including those predicated upon those portions of the statute which are admittedly unconstitutional. It also means that the sentence was partially predicated on the unconstitutional portions of the statute. It certainly needs no citation of authority to establish the proposition that a trial court has no jurisdiction to enter a judgment convicting an accused of acts which are lawful. Petitioners have exhausted the only other remedy available to them, namely, an appeal. On that appeal the constitutionality of the statute was in issue, and the court to which the appeal was taken had jurisdiction to reverse the judgment of conviction and retry the case upon issues raised by a plea of not guilty of the unlawful act charged. Since this is so, habeas corpus is now the only remedy available to petitioners.

On a habeas corpus proceeding the only question involved is one of jurisdiction, namely, did the court below have the lawful authority to make or issue the particular order, judgment or process under attack. (See the many cases from the United States Supreme Court, California Supreme Court and other state courts collected and commented on in 22 Am. Jur. 159, sec. 26; 13 Cal. Jur. 222, sec. 7.) All courts are agreed on this point. While there is some confusion in the cases as to the meaning of the term "jurisdiction," as used in habeas corpus proceedings, the overwhelming weight of authority is to the effect that the term includes more than the question as to whether the trial court had jurisdiction over the person and subject matter. It is now settled that jurisdiction over the person and subject matter is not alone conclusive, but that the jurisdiction of the court to make or render the order or judgment that serves as the basis of the imprisonment is a proper subject of inquiry. Stated another way, jurisdiction to render the particular order or judgment in question is deemed as essential as is jurisdiction of the person or subject matter. (See cases collected and commented on in 22 Am. Jur. 161, sec. 27; 76 A. L. R. 469.)

Moreover, it must be remembered that petitioners were con-

victed in an inferior court and not by a superior court. As to such courts, no presumption will be indulged as to the regularity of the proceedings therein. It has been consistently held that, as to justice's courts, nothing will be presumed in favor of their jurisdiction. (*Antilla* v. *Justice's Court*, 209 Cal. 621 [290 Pac. 43], and numerous other authorities cited in the foot note to 6 Cal. Jur. 10 Yr. Supp. 611, sec. 85.)

Even if it be conceded, as erroneously held in the majority opinions, that there is a presumption of regularity of the proceedings in a justice's court, there is no basis for the application of such a rule here, for the reason that it affirmatively and conclusively appears on the face of the record itself that petitioners were charged, convicted and sentenced for the commission of acts which both this court and the Supreme Court of the United States have held to be beyond the power of the state or its political subdivisions to proscribe.

Tested by these standards, and, keeping in mind the fact that the convictions were here had in an inferior court, the judgment of conviction is subject to collateral attack on habeas corpus. The trial court, although it may have had jurisdiction of the person and subject matter, had no jurisdiction to convict and sentence the petitioners for offenses based wholly or in part on an unconstitutional statute. While it is true that habeas corpus will not always issue where other remedies are available, it is settled that habeas corpus properly may be used to test the constitutionality of a statute (see cases collected and commented on in 13 Cal. Jur. 225, sec. 8), and that the fact that a remedy by appeal may exist is not a complete bar to the proceeding. Certainly, where, as in this case, the petitioners appeal and raise the question of the constitutionality of the statute on such appeal, and, where the court to which the appeal is taken has complete jurisdiction to pass on the question, but, nevertheless affirms the invalid judgment, habeas corpus is available.

A writ of habeas corpus should therefore be granted and the petitioners discharged from custody.

Petitioner's application for a rehearing was denied March 12, 1942. Carter, J., voted for a rehearing.