[Crim. No. 3697. Second Dist., Div. One. July 28, 1943.]

In re F. A. CLARKE on Habeas Corpus.

Marshall Stimson and Noel Edwards for Petitioner.

Fred N. Howser, District Attorney (Los Angeles), and Jere J. Sullivan, Deputy District Attorney, for Respondent.

22

YORK, P. J.—Petitioner applied for a writ of habeas corpus and was granted a hearing upon his averment that he was "imprisoned, detained, confined and restrained of his liberty by the Sheriff of Los Angeles County, State of California, in the County Jail . . . that said imprisonment, detention, confinement and restraint are illegal. . . ."

The commitment of petitioner to a jail sentence of ninety-five days and the infliction of fines in the sum of $9,500 for contempt of court arose out of the civil action of *Taylor* v. *Clarke* which was initiated March 6, 1940, seeking declaratory relief and an accounting, the complaint therein alleging a partnership between the parties to the action in the Boncquet Laboratories. The answer of defendant Clarke (petitioner here) denied the partnership and alleged the existence of a lease by Taylor to Clarke whereby the latter had leased for a term of three years certain assets which had theretofore been purchased by Taylor from the trustee in bankruptcy of Boncquet Laboratories. Further, that from April 1, 1937, with full knowledge of Taylor, said defendant Clarke had carried on the business individually under the fictitious name of Boncquet Laboratories for his own individual benefit and profit and as sole owner thereof.

On April 24, 1940, upon hearing on an order to show cause and for appointment of a receiver and for a restraining order in said civil action, at which hearing Clarke and his attorneys were present, an injunction pendente lite issued enjoining and restraining the said Clarke "*from withdrawing any funds of the business of the Boncquet Laboratories on deposit in any bank or banks, except such as are reasonably necessary in the ordinary and usual course of business,* and from disposing of any of the assets of the business of the Boncquet Laboratories, either directly or indirectly, except such as is reasonably necessary in the ordinary and usual course of business, until the further order of this court.'' (Emphasis added.)

Thereafter, from May 1, 1940, to and including August 6, 1941, petitioner Clarke from time to time withdrew sums of money, aggregating the sum of $35,761.39, from the bank or banks where accounts were maintained by Boncquet Laboratories. Under date of June 11, 1941, L. N. Dechene subscribed to an affidavit setting forth facts constituting the alleged contempt, which facts he averred were ascertained by him wholly from certain books of account of the Boncquet

Laboratories; and an order to show cause was issued thereon on June 11, 1941, against petitioner and his attorneys. On June 17, 1941, said L. N. Dechene filed an amended affidavit reciting more specifically the matters covered by the first affidavit and alleging additional facts (also gleaned by him from certain books of account) charging petitioner with violating the injunction order of April 25, 1940, i.e., the withdrawal of various sums of money from the bank, whereupon a second order to show cause based upon the amended affidavit was duly issued directed to petitioner. Thereafter, on July 23 and 24, 1941, the matter came on for hearing before the Honorable Ruben S. Schmidt, as Judge of the Superior Court of Los Angeles County, who found petitioner and his attorneys "not guilty" of contempt and ordered them discharged and the proceeding dismissed. This order was later annulled by the Supreme Court (*Taylor* v. *Superior Court,* 20 Cal.2d 244 [125 P.2d 1]), and said orders to show cause *in re* contempt were then set for hearing before the Honorable Charles S. Burnell, as judge of the superior court, who, on January 18, 1943, made his findings of fact and issued an order and decree adjudging petitioner guilty of nineteen separate contempts of court and committed petitioner to the custody of the Sheriff of Los Angeles County. Having served over fifty days of the sentence imposed upon him, petitioner seeks to procure his release from custody through the instant proceeding in habeas corpus.

The injunction pendente lite was directed against petitioner "his agents and attorneys, and counsellors" and the amended affidavit of L. N. Dechene specifically averred that certain sums of money withdrawn from the bank by petitioner were paid to and accepted by his attorneys. Both orders to show cause *in re* contempt issued June 11 and June 17, 1941, respectively, were directed to petitioner and his attorneys therein named. However, at the hearing on said orders to show cause before Judge Burnell, the matter was dismissed as to said attorneys, leaving petitioner "as the sole person against whom this proceeding is prosecuted."

The court found, as to each of the nineteen violations of the injunction pendente lite, that the amount specified therein as having been withdrawn from the bank "was for the personal use and benefit of the defendant, F. A. Clarke; that the withdrawal and use of said sum by said F. A. Clarke, from said account was a deliberate, intentional, and willful

violation of the terms of the Restraining Order and Judgment made by the Hon. Emmet H. Wilson, on the 25th day of April, 1940 . . . ; that the withdrawal and use of said sum by said F. A. Clarke, was not reasonably necessary in the ordinary and usual course of business of Boncquet Laboratories.''

Further, that petitioner ''withdrew the total sum of $35,761.39, from time to time, subsequent to the 25th day of April, 1940, as specifically set forth hereinabove in Findings No. V, to No. XXIII, inclusive. That all of the withdrawals made by said defendant, F. A. Clarke, totalling the sum of $35,761.39, were for the personal use and benefit of said defendant, F. A. Clarke, and which sums of money were used by said F. A. Clarke, and were not reasonably necessary in the ordinary and usual course of business of Boncquet Laboratories. . . . that . . . the withdrawals . . . constitute nineteen separate and distinct, deliberate, intentional, and willful violations of the terms and provisions of the Restraining Order and Judgment. . . .''

The judgment *in re* contempt ordered that as punishment for *each* of the nineteen counts, petitioner be imprisoned in the county jail for a period of five days and pay a fine of $500, and in the event of nonpayment of such fines, that he be imprisoned one day for each $2 in default, the sentences on the nineteen counts to run consecutively. It was also provided that in lieu of serving the said terms of imprisonment and paying the fines imposed, petitioner might purge himself of said contempts by returning the sum of $35,761.39 withdrawn by him and by depositing the same in a named bank to the credit of Boncquet Laboratories.

In his petition for writ of habeas corpus, petitioner avers that the total sentences imposed upon him by said judgment amount to an imprisonment of 95 days in the county jail and the payment of $9,500 in fines; and ''in the event of his failure to pay said fines . . . (he) is to be imprisoned an additional day for each two dollars of said fines, being in all 4,750 days in addition to said 95 days, or a total of 4,845 days, being thirteen (13) years and one hundred (100) days.''

At the hearing *in re* contempt before Judge Burnell, the main witness was L. N. Dechene, a public accountant, who made the affidavits upon which the contempt proceeding is founded, and who testified directly from the books of the Boncquet Laboratories respecting the items of withdrawals

alleged to have been made in violation of the injunction pendente lite. The contemner Clarke produced no evidence at said hearing, but the affidavits which he made in response to the affidavits of L. N. Dechene are before this court in the instant proceeding.

In petitioner's affidavit dated June 13, 1941, in response to the order to show cause dated June 11, 1941, he alleged "that at no time since the 25th day of April, 1940, have there been and there are not now any funds of the business of the Boncquet Laboratories on deposit in any bank or banks, and that Boncquet Laboratories is not, and at no time since April 25, 1940, has been, an entity, and owns no property, money or assets, and conducts no business.

"That affiant further says that all monies or funds withdrawn by affiant from any bank or banks between the 25th day of April, 1940, and the 1st day of April, 1941, have been such as are reasonably necessary in the ordinary and usual course of business of affiant, to-wit: F. A. Clarke, doing business under the fictitious firm name and style of Boncquet Laboratories; that any assets disposed of by affiant, directly or indirectly, between the 25th day of April, 1940, and the 1st day of April, 1941, have been disposed of in the ordinary and usual course of business. That any and all attorneys' fees and costs and expenses of litigation paid out by affiant from the 25th day of April, 1940, have been paid out of affiant's usual and ordinary drawing account, or from funds derived from sources other than the business known and designated as F. A. Clarke, doing business under the fictitious firm name and style of Boncquet Laboratories; that all attorneys' fees and costs and expenses of litigation paid by affiant since the 25th day of April, 1940, have been reasonably necessary and have been paid in the ordinary and usual course of business."

In petitioner's affidavit dated June 21, 1941, made in opposition to the amended affidavit of L. N. Dechene, it was alleged among other things: "That for several months prior to the 25th day of April, 1940, affiant (Clarke) had been withdrawing from the profits of his said business which he was conducting under the fictitious firm name and style of Boncquet Laboratories, approximately One Thousand Dollars ($1,000.00) per month, for the personal and living expenses of himself and family; that since the 25th day of April, 1940, and to the 1st day of April, 1941, affiant has continued

to draw from the profits of his said business approximately the same amount per month for said purposes. Affiant alleges that such withdrawals were 'reasonably necessary in the ordinary and usual course of business,' and were not directly, or indirectly, in violation of, or contrary to, said injunction pendente lite; that affiant was devoting all of his time to said business, and without assistance of any other salesman consummated the large sales which occasioned the said profits. That during the year 1939 the gross sales of the business conducted by affiant under the fictitious name of Boncquet Laboratories were in excess of One Hundred Eight Thousand Dollars ($108,000.00), but that due to the time necessarily spent by affiant in connection with the litigation in the above entitled case (*Taylor* v. *Superior Court*), and the obstructions caused by said litigation and by plaintiff in connection therewith the gross sales of affiant's said business for the year 1940 amounted to approximately Seventy-eight Thousand Dollars ($78,000.00).''

Petitioner specifies in his brief twenty-three grounds which he contends show that his imprisonment is illegal because the court exceeded its jurisdiction in adjudging him guilty of contempt of court, and concludes with the following statement:

''Upon consideration of the entire record on behalf of petitioner . . . and the authorities cited in this brief it has been shown:

''(1) That the injunction was invalid;

''(2) That the bond did not constitute a legal obligation;

''(3) That the affidavits upon which the injunction was based did not state facts which showed that there had been a violation of the injunction by the petitioner;

''(4) That there was no evidence to support the findings of the court;

''(5) That the order and commitment of the Superior Court was one which the court had no jurisdiction to make . . . because it violated the rights of the petitioner under both the Constitution of the State of California and of the United States.''

It is first contended by petitioner, and conceded by respondent, that on habeas corpus the scope of the inquiry may extend to a review of the entire record in an effort to ascertain whether the court had jurisdiction and whether such jurisdiction was exceeded. This contention is supported

by the cases of *Brunton* v. *Superior Court,* 20 Cal.2d 202 [124 P.2d 831] ; *Bridges* v. *Superior Court,* 14 Cal.2d 464 [94 P.2d 983] ; and *Rose* v. *Superior Court,* 44 Cal.App.2d 599 [112 P.2d 713]. See, also, *In re Lake,* 65 Cal.App. 420 [224 P. 126].

In the Lake case, *supra,* a proceeding in habeas corpus to review a contempt alleged to have been committed in the immediate view and presence of the court, it was held: (p. 423) ''The statute, section 1222, of the Code of Civil Procedure, declares that the judgment in cases of contempt is final and conclusive. Thus, one who has been adjudged guilty of contempt has but two remedies—habeas corpus and certiorari. The scope of the inquiry which the court can make upon either habeas corpus or certiorari is precisely the same. [Citing cases.] While neither writ is one of error, both extend to the entire record of the court below and to the evidence itself when necessary to determine jurisdiction. (*Hotaling* v. *Superior Court,* 191 Cal. 501 [29 A.L.R. 127, 217 P. 73, 75].) This inquiry, of course, cannot go beyond the question of jurisdiction and the review of the evidence is limited to the sole purpose of determining first, whether jurisdiction existed; and, second, whether jurisdiction was exceeded. Thus, where the question is whether jurisdictional facts were or were not proved, the review extends not only to the entire record, but to the evidence itself. [Citing cases.] . . . *In reviewing this proceeding, the charge, the evidence, the findings and the judgment are all to be strictly construed in favor of the accused . . . and no intendments or presumptions can be indulged in aid of their sufficiency. . . .*

''There is no deviation from the rule that unless the affidavit charging constructive contempt 'contains a statement of facts which shows on its face that a contempt has been committed, the court is without jurisdiction to proceed in the matter and any judgment of contempt thereon is void. (5 Cal. Jur., pp. 938, 939.) . . . The proceeding being one of a criminal nature, a conviction of the offense can be supported only on a showing that the acts charged come within the definition of the offense.''

See, also, *Wilde* v. *Superior Court,* 53 Cal.App.2d 168 [127 P.2d 560] ; *In re Bell,* 19 Cal.2d 488 [122 P.2d 22].

The question raised by petitioner with respect to the validity of the bond required to be posted by the injunction order is sufficiently answered by the decisions in *Taylor* v.

*Superior Court*, 20 Cal.2d 244 [125 P.2d 1], and *Yellen* v. *Fidelity & Casualty Co.*, 115 Cal.App. 434 [1 P.2d 1019].

Petitioner's main contention is that the injunction order of April 25, 1940, is void, because "the language of the order enjoining petitioner from withdrawing any funds 'except such as are reasonably necessary in the ordinary and usual course of business,' is so vague and uncertain as to render it impossible for petitioner to know what he might or might not do."

There is no doubt that the language used in the order is subject to different interpretations. It clearly prohibits petitioner from withdrawing funds—either dissipating or throwing away the funds of the company, but on the other hand, it permits him to withdraw such funds as are reasonably necessary in the ordinary and usual course of business. It would therefore appear that the burden was upon the plaintiff in the contempt proceeding to prove what the money withdrawn from the bank was used for.

Inasmuch as the order which forms the basis of the alleged contempt is qualified and authorizes expenditures reasonably necessary in the ordinary course of business, the question as to what expenditures come within the meaning of the order is left open. Honest opinion can differ as to what constitutes expenditures reasonably necessary in the ordinary course of business. Manifestly, something more than a difference of opinion is necessary to sustain a judgment in contempt.

The amended affidavit of Dechene, which superseded his first affidavit and is the only basis for the proceeding *in re* contempt, avers in the first twenty-three paragraphs thereof that petitioner "contrary to and in violation of the restraining order" withdrew sums of money then on deposit with certain banks under the name of F. A. Clarke, doing business as Boncquet Laboratories, and paid the same to his attorneys. These are averments, not of fact, but of mere conclusions of law. There is neither averment nor proof to be found in the record that such payments were not reasonably necessary in the ordinary and usual course of business.

There then follow averments XXIV to XXX, amounting to conclusions of law only, that petitioner "contrary to and in violation of the restraining order" withdrew from certain named banks, specified sums of money "for his own use and benefit," which funds were on deposit in said banks under the name of F. A. Clarke, doing business as Boncquet Laboratories.

Petitioner in his affidavit in response to the first order to show cause averred that all attorneys' fees paid by him since April 25, 1940, "have been reasonably necessary and have been paid in the ordinary and usual course of business." Moreover, in his affidavit in opposition to the amended affidavit of Dechene, petitioner admitted he had withdrawn during the period of April 25, 1940, to April 1, 1941, the sum of $1,000 per month for his own salary, and that such withdrawals were reasonably necessary in the ordinary and usual course of business, for the reason that he was devoting all of his time to the business and, without the assistance of any other salesman, consummated sales which resulted in gross sales of $78,000 for the company's product in the year 1940.

At the trial *in re* contempt, Dechene, the author of the hereinbefore mentioned affidavits, was the principal witness. He testified he was a public accountant and had made an audit of the books of the Boncquet Laboratories. In answer to the question: "I will ask you if your books show that any of that money (withdrawals) was used—what the money was used for?," said witness replied: "It only shows that it was withdrawals, that were charged to his account." Again, when asked, "Referring to the books of the Boncquet Laboratories, are all expenditures that were made by Mr. Clarke during that time reflected in the books of the Boncquet Laboratories; that were expended in the business?," the witness answered: "Yes. There are various expense accounts set up, where any money that was primarily for the business would be charged to the respective accounts. Q. By Mr. Fox: These sums of money which you have referred to—there is no record kept of these expenditures being placed to any particular item, or account, for the business? . . . A. In Mr. Clarke's drawing account— . . . Q. And according to the books as you interpret them that was his drawing account for the maintenance of himself, in the management of the business? A. Not for the management of the business. They cover the personal expense, income tax and any money he may expend in any way he sees fit, but none of the money has ever come back into the business. . . . Q. None of that money, so far as the books show, was used for the necessary running expenses of the business of the Boncquet Laboratories? A. The amounts I have recorded are all drawing account, F. A. Clarke, or in payment of the account of Hastings and Baker (attorneys)."

On cross-examination, said witness testified that the books

of the Boncquet Laboratories were kept as an individual account, and not as a partnership account; that they did not reflect anywhere that they were a partnership account; that, according to the books, all the money that came into the business was kept in an individual or personal account, as a sole proprietorship; that all the books and all the records of the company state that they were records of F. A. Clarke, doing business as Boncquet Laboratories.

In answer to a question put to him by the court, i.e., "You have stated generally the method of bookkeeping. Was that method used in this concern, in these books?, the witness stated: "It was used in this set of books, as a sole proprietorship. The withdrawals, as I explained the other day, subsequent to April 24th, 1940, were in the amount of $12,046.92, chargeable directly to Mr. Clarke. There was an item also in addition to that—there was charged against his Investment Account the amount of $3,471.03 which . . . would reflect the net investment at the end of the period."

Upon cross-examination the following occurred: "By Mr. Salem. Q. Mr. Dechene, as far as these books are concerned, do they indicate that they are the books of F. A. Clarke, doing business as Boncquet Laboratories? A. That is an interpretation, that anyone is a sole proprietor. They may operate under a name, doing business as any fictitious name. Q. Do these books reflect F. A. Clarke doing business as Boncquet Laboratories? A. That is the way the books are set up. . . . Q. As a matter of fact, those withdrawals set forth as of May 1st, 1940, to and including August 6th, 1941, were made from books which were audited by or prepared by some one other than yourself? A. Yes. Q. You were merely taking what the books reflected? A. Yes. Q. As a matter of fact, these are all withdrawals by F. A. Clarke from funds belonging to the Boncquet Laboratories, by F. A. Clarke doing business as Boncquet Laboratories? Answer 'Yes' or 'No.' A. Yes."

As to the various sums of money averred by the amended affidavit as having been withdrawn by petitioner from the funds of the company, the following is a typical example of the testimony offered to prove such averment: "Q. The item under date of May 24th, 1941, $415, according to the books is that a correct notation that that amount of money was paid to Eldon V. Soper, Baker and Hastings? A. According to the books of the Boncquet Laboratories, that is just the same as the item just mentioned previously. It is a cash item,

drawn from a check in the amount of $615. $415 is charged to Accounts Payable and $200 is charged to F. A. Clarke, drawing account, tracing the $415 from the Accounts Payable into the detail ledger, then we find it is posted to the account of Eldon V. Soper, Hastings and Baker. . . . Q. Do the books themselves show who made the withdrawals which are charged on the books to F. A. Clarke drawing account? A. I don't get that question, exactly. The books reflect that this money has been withdrawn, and charged to F. A. Clarke's personal withdrawals. Q. But they do not disclose, in and of themselves, who made the withdrawals, do they? A. I cannot say only what the record shows, that there are certain accounts charged to Mr. Clarke and apparently he got them, or they would not be charged to him.''

 Respondents rely upon an averment in the amended affidavit of Mr. Dechene to the effect that at the time the injunction pendente lite was issued by Judge Wilson, he ''informed Girard F. Baker that it would be improper for him or any other person to withdraw from the funds of Boncquet Laboratories, any sum whatsoever for and on account of attorneys' fees pending the trial of said cause (*Taylor* v. *Superior Court*), and ordered said attorney, Girard F. Baker, or any other person on his behalf, not to withdraw any funds on account of attorneys' fees pending the trial of said case.'' Any oral statements made by the judge at the time the injunction was granted and which were not incorporated in the written order are completely dehors the record and cannot be considered by this court.

In the case of *Wilde* v. *Superior Court*, 53 Cal.App.2d 168, 178 [127 P.2d 560], it is stated: ''Jurisdiction of the court in contempt cases, like those in which reviews of awards of the Industrial Accident Commission are sought, depends on the existence of evidence showing that an actual contempt of court has been committed. In the absence of such evidence a court pronouncing a judgment of contempt lacks jurisdiction and its order should be annulled. (*In re Lake, supra* [65 Cal.App. 420 (224 P. 126)]; *In re Chaus, supra* [92 Cal.App. 384 (268 P. 422]; *In re Cunha,* 123 Cal.App. 625 [11 P.2d 902, 18 P.2d 979]; *In re Cutler,* 1 Cal.App.2d 273 [36 P.2d 441]; *In re Roberts,* 2 Cal.App.2d 70 [37 P.2d 477]; *King* v. *Superior Court,* 12 Cal.App.2d 501 [56 P.2d 268]; *In re Critchlow,* 11 Cal.2d 751 [81 P.2d 966].)

''The reasons for this rule in contempt cases are stated in *King* v. *Superior Court, supra,* as follows:

" 'When jurisdiction to inquire and act depends upon the existence of certain facts, the absence of proof of such facts limits the power to that of inquiry only, and if action is attempted it is in excess of jurisdiction. The same reasoning is applied to cases before the Industrial Accident Commission. . . .'

"As we have seen, neither the trial court nor this court can indulge in any presumptions against one charged with contempt. . . . There is a presumption 'that there was a good and valuable consideration for a written contract' . . . and also, what has been characterized as one of the strongest presumptions 'That a person is innocent of crime or wrong' (subd. 1, sec. 1963, Code Civ. Proc.)."

A careful examination of the record in the instant proceeding discloses an absence of any substantial evidence tending to prove that the withdrawals made by petitioner were not "reasonably necessary in the ordinary and usual course of business" of the Boncquet Laboratories. Consequently, the trial court exceeded its jurisdiction when it found petitioner guilty of contempt.

For the foregoing reasons the order of commitment is annulled, and the petitioner is discharged from custody.

Doran, J., and White, J., concurred.